(201 P.3d 728)
No. 97,040

STATE OF KANSAS, *Appellee,* v. ROBERT D. BLAUROCK, *Appellant.*

Opinion filed February 27, 2009.

*Jocilyn B. Oyler*, of Kansas Appellate Defender Office, for appellant.

*Amory K. Lovin*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Stephen N. Six*, attorney general, for appellee.

Before STANDRIDGE, P.J., PIERRON and GREEN, JJ.

GREEN, J.: Robert Blaurock appeals his jury trial convictions and sentences for rape, aggravated criminal sodomy, and sexual exploitation of a child. Blaurock raises five arguments on appeal. First, Blaurock argues that the trial court erred in admitting evidence of other crimes he allegedly committed against the victim in this case. Nevertheless, we determine that the other crimes evidence was admissible to prove plan and identity under K.S.A. 60-455. Although the trial court did not conduct the appropriate analysis under K.S.A. 60-455 before admitting the evidence, the error was harmless. Moreover, under the particular facts of this case, the lack of a limiting instruction on plan and identity did not constitute reversible error. Accordingly, Blaurock's argument fails.

Next, Blaurock contends that the trial court erred in allowing an unredacted videotape to be given to the jury in this case. Nevertheless, Blaurock's failure to request redaction of the videotape precludes appellate review of this issue. Next, Blaurock maintains that the State violated his statutory right to a speedy trial by failing to bring him to trial within 90 days under K.S.A. 22-3402. Blau-

rock's argument fails for two reasons: (1) Blaurock was not being held in custody solely for the subject criminal charges in his second trial; and (2) the trial court did not abuse its discretion in granting the State's continuance and, therefore, the State had 180 days to bring Blaurock to trial under K.S.A. 22-3402. As a result, we agree with the trial court that there was no violation of Blaurock's statutory speedy trial right under K.S.A. 22-3402.

Next, Blaurock argues that the combination of errors in this case deprived him of a fair trial. Nevertheless, because Blaurock has not established any error in this case, his argument on this issue fails. Finally, Blaurock contends that the trial court erred in using his criminal history, which was not proven to a jury beyond a reasonable doubt, to increase his penalty. Blaurock's argument is controlled by our Supreme Court's decision in *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002). As a result, his argument fails. Accordingly, we affirm.

*First Trial*

In November 2005, Blaurock went to trial on 10 counts of rape in violation of K.S.A. 21-3502; 1 count of aggravated kidnapping in violation of K.S.A. 21-3421; 1 count of aggravated criminal sodomy in violation of K.S.A. 21-3506 with an alternative count of criminal sodomy in violation of K.S.A. 21-3505; and 1 count of sexual exploitation of a child in violation of K.S.A. 21-3516. Each of the rape counts had an alternative count of aggravated indecent liberties with a child in violation of K.S.A. 21-3504. The counts were all based on allegations of sexual misconduct by Blaurock against his girlfriend's 14-year-old daughter, C.S. Blaurock lived with C.S. and her mother, Tammy. The alleged acts took place after April 30, 2005, and before May 25, 2005; on May 25, 2005; and on June 1, 2005.

After a 3-day trial, the jury found Blaurock guilty of one count of aggravated indecent liberties with a child based on the June 1, 2005, incident. The jury acquitted him of seven counts of rape (with alternative counts of aggravated indecent liberties with a child), which were based on the allegations of sexual misconduct occurring after April 30, 2005, and before May 25, 2005. The jury

acquitted him of aggravated kidnapping, which was based on the May 25, 2005, incident. Finally, the jury was unable to reach a verdict on two counts of rape, which were based on the May 25, 2005, incident; the count of aggravated criminal sodomy (alternative count of criminal sodomy), which was based on the June 1, 2005, incident; and one count of sexual exploitation of a child, which was based on pictures taken during the June 1, 2005, incident.

*Second Trial*

In April 2006, the State brought Blaurock to trial for the second time on one count of rape (alternative aggravated indecent liberties with a child), which was based on the May 25, 2005, incident; one count of aggravated criminal sodomy (alternative criminal sodomy), which was based on the June 1, 2005, incident; and one count of sexual exploitation of a child, which was based on pictures taken during the June 1, 2005, incident.

*May 25, 2005, Incident*

At Blaurock's second trial, C.S. testified that on the morning of May 25, 2005, she was awakened by Blaurock flipping her over, tying her wrists behind her back, and placing duct tape over her mouth. Blaurock eventually took the duct tape off of C.S.'s mouth because she was having problems breathing. Blaurock tried to lead C.S. to his bedroom, but C.S. ran into the kitchen and grabbed a knife on the counter. C.S. testified that she was going to slit her throat because she did not want to have sexual intercourse with Blaurock. Nevertheless, C.S.'s hands were still tied behind her back, and she was unable to reach her throat. Blaurock took the knife away from C.S. and then dragged her to his bedroom.

According to C.S., Blaurock threw her on his bed and told her that they were going to have sex every day for a period of months. C.S. testified that she was crying and telling him no. C.S. further testified that Blaurock said that if they missed a day, then one of her friends or relatives was going to disappear. According to C.S., Blaurock had her cousins' and friends' pictures and their addresses on a piece of paper that he showed to her.

C.S. testified that Blaurock undressed her and forced her to have sex with him that morning while her hands were still tied. Moreover, after he untied her hands, Blaurock told C.S. that they were going to take sexual pictures. C.S. testified that she unwillingly sat on Blaurock's face, and Blaurock took a picture of them through the mirror on the headboard of the bed.

C.S. testified that as Blaurock was dragging her to the bedroom during the May 25 incident, he hit her in the eye. Tammy later noticed a bruise on C.S.'s face. When Tammy asked about the bruise, C.S. told Tammy that she did not know what had happened. Tammy tried to question C.S. further, but C.S. became irritated and asked Tammy to drop the matter. Blaurock's brother, Marty Blaurock, testified that he had noticed C.S.'s black eye between May 25 and June 1, 2005. Nevertheless, Marty testified that Blaurock, Blaurock's son Johnathan, and Mike Wertacet had told him that Tammy had become angry and had hit C.S. in the eye.

*May 1, 2005, through May 24, 2005, Incidents*

C.S. testified that Blaurock had abused her ealier in May 2005 before the May 25 incident. C.S. could not remember the number of times the abuse had occurred before May 25. C.S. testified that Blaurock would wake her up every other morning as soon as her mother left for work around 6:45 a.m. and would sexually abuse her. According to C.S., the incidents happened between when her mother left for work and when C.S. left the house around 7:25 a.m. to catch the bus for school. One morning at school after the sexual abuse happened a couple of times, C.S. told her friend, D.P. D.P. testified that she told C.S. to report the incident.

C.S. recounted a particular incident in May 2005, where Blaurock had told her that she was pregnant and that he needed to put a little white pill in her vagina and have sexual intercourse with her three times that day. Blaurock told C.S. that if they did that, she would not be pregnant anymore. According to C.S., Blaurock placed the pills in her vagina three times on that particular day, and she and Blaurock had sexual intercourse each time. C.S. testified that on that particular day, she was out of school due to either a teacher in-service day or to her being ill.

C.S. testified that during the month of May, Blaurock had given her bellybutton rings and shirts. In addition, Blaurock and Tammy had given C.S. tickets to two concerts. C.S. testified that she felt like Blaurock was buying these items so she would have·sex with him.

*June 1, 2005, Incident*

C.S. testified that no sexual abuse occurred after May 25, 2005, and before June 1, 2005. On June 1, 2005, however, C.S. was at the dining room table on the telephone with D.P. when Blaurock told her to get off the telephone. When C.S. got off the telephone, Blaurock told her to go to the bedroom. According to C.S., she told Blaurock "no" and began to argue with him. Blaurock then pulled her to his bedroom and told her to take off her pants. C.S. testified that she curled up in a ball on the bed because she did not want any sexual abuse to occur.

C.S. testified that Blaurock undressed himself, pulled C.S.'s shorts off, and forced her to have sexual intercourse with him. C.S. further testified that after they had sexual intercourse, Blaurock forced his penis into her mouth and then photographed her. According to C.S., she was upset and crying and kept telling Blaurock "no," but she eventually complied with his request because she wanted to end the incident. C.S. testified that Blaurock then made her sit on his penis, and he took another picture.

C.S. testified that after the incident was over, she got up and ran to the bathroom. Blaurock then went outside. C.S. called D.P. and told her that Blaurock had raped her. D.P. encouraged C.S. to get help. C.S. then went to see her neighbor, M.T., who lived two houses away, and asked to use her telephone. C.S. called the police and told them that she. had been raped by Blaurock. C.S. then called Tammy at work and told her that Blaurock had raped her.

When Officer Miguel Pena arrived at M.T.'s home, he was met outside by C.S. and Tammy. Both C.S. and Tammy told Pena that C.S.'s stepfather had raped her. Although Blaurock and Tammy were never married, Blaurock had lived with C.S. and Tammy since 1996. Blaurock's son, Johnathan, who was 20 years old when the

incidents occurred in this case, had lived with C.S. and Tammy since he was 11 years old.

While Pena was talking to C.S. and her mother outside of M.T.'s home, Blaurock pulled into the driveway of his home. Pena and Officer Ronald Sutton began walking toward Blaurock, and Sutton yelled at Blaurock to stop. Nevertheless, Blaurock failed to acknowledge the officers and hurriedly went into the house. Sutton knocked on the door and attempted to open it, but the door was locked. A few minutes later, Blaurock came out of the side door and was met by Pena. Blaurock was taken into custody. After Blaurock was in custody, he spontaneously asked Sutton, "Do you have any suggestions for life after this?"

After Blaurock was arrested, C.S. was taken to the University of Kansas Medical Center, where she had a rape examination performed. C.S.'s underwear was collected at the hospital. With Tammy's permission, crime scene investigators searched the house for evidence of sexual abuse. A Polaroid camera was collected during the search, but no pictures of the sexual abuse were found at that time. The next day, C.S. was interviewed by a social worker at the Sunflower House about the alleged sexual abuse. Her interview was videotaped and played for the jury at trial. While at Sunflower House, C.S. revealed that she had changed her underwear right after the sexual assault that occurred on June 1. After the interview, a detective followed C.S. and Tammy back to their house and collected the underwear, which Tammy had placed in a bag.

Three days after the June 1 incident, while searching for the pictures that Blaurock had taken of the incidents, Tammy saw something sticking out above the garage door. Tammy got up on a step stool and pulled down a plastic bag that contained loose condoms and sexual lubricant, a package of unopened Polaroid film, and an opened package of Polaroid film. Inside the opened package of film, Tammy found a picture of C.S. in which C.S. was visibly upset and had a penis in her mouth.

Michael, C.S.'s natural father, who was also searching for the pictures, then reached up into the area where Tammy had been searching and found two more pictures of two individuals engaged in sexual conduct. Michael testified that one of the individuals in

the pictures appeared to be C.S. Michael's wife called the police, and the crime scene investigation unit recovered the items found. In addition to the items previously mentioned, the crime scene investigation officer recovered two empty boxes of condoms and a sex toy.

### Blaurock's Letters

While Blaurock was in jail, he sent several letters to his mother. In one of the letters, Blaurock told his mother to call C.S.'s mother and make clear that he was "not exactly defenseless." Blaurock stated that C.S. was "not really very innocent," that C.S. had M.T. as a coconspirator, and that every act with C.S. was consensual. Blaurock asserted that if the real truth were made known, C.S. would be in trouble and Tammy would lose custody of her.

Blaurock further asserted in one of his letters that on days when some of the alleged incidents had occurred, C.S. either had skipped school or had called him to come get her from school so that she could spend time with him. In addition, alleging that C.S. had behaved in a sexually explicit manner towards him, Blaurock gave reasons for his behavior: (1) that C.S. would peek through the bedroom door to watch him while he was naked; (2) that C.S. would come into his room while he was getting dressed; (3) that after Tammy left in the morning, C.S. would barge into the bathroom while Blaurock was naked; (4) that C.S. would call Blaurock's name and fully expose herself to him while she was in the shower; (5) that C.S. had showed him how she shaved her pubic area; (6) that C.S. would call Blaurock into her room while she was naked or changing underclothes; (7) that C.S. wanted head-to-toe massages while she was naked; (8) that C.S. had used her body to get gifts and money from Blaurock; (9) that C.S. would get into bed with him once Tammy left in the morning; and (10) that C.S. would jump up and down on his bed while she was naked until Blaurock eventually joined in with her.

Moreover, Blaurock alleged that he had suspected C.S. was having sex with "Derek" or another boy after examining her underwear; that C.S. was using drugs; that he had helped C.S. pass drug tests by buying her over-the-counter cleansing agents; that C.S.

had repeatedly asked him to kill her natural father; and that C.S. had threatened to tell Tammy about C.S. and Blaurock if he did not kill her father.

In one of his letters, Blaurock admitted to having sexual intercourse with C.S. on June 1, 2005. Blaurock asserted that after they had sexual intercourse, C.S. stated that Blaurock was just like her natural father and that she wanted him dead, and then she ran out of the room. Blaurock alleged that C.S. and M.T. had devised a plan to get rid of him so that they could have their summer vacation without any interruptions.

Blaurock wrote several letters in which he encouraged C.S.'s mother to get C.S. to change her report. Blaurock went so far as to outline what C.S. could say in a sworn affidavit to show that he had not done what she had alleged. Blaurock threatened that if the case went to trial, everything about C.S.'s and Tammy's lives would be exposed.

Blaurock's mother sent Blaurock's letters to Tammy. After receiving the letters, Tammy wrote to Blaurock and told him that she and C.S. were not going to testify. Tammy testified that she was angry when she had received the letters and had written Blaurock because she did not want him to enter into a plea agreement.

*Blaurock's Testimony and Evidence*

At trial, Blaurock admitted that he wrote the letters but testified that he had falsified the information. Blaurock denied that it was him depicted in the three photos admitted into evidence at trial. In denying that it was his penis shown in one of the pictures, Blaurock testified that he had a hernia approximately half the size of a bar of soap in his pelvic area. Moreover, Blaurock testified that he had never used the Polaroid camera to take pictures of C.S. while she was engaged in sexual acts.

Blaurock testified about his work activities on May 25, 2005, and denied that he had committed any of the acts that allegedly occurred that day. Moreover, Blaurock's testimony was that he was busy with job estimations and other activities on June 1, 2005. Blaurock's son, Johnathan, testified that he had gotten home around 10:30 on the morning of June 1, 2005, and gone to sleep

in his room in the basement. Nevertheless, he did not hear any "commotion" upstairs until the police began searching the house that afternoon.

During the first part of May, Blaurock's friend, Mike Wertacet, was also living at the house. According to Blaurock, both Johnathan and Mike would be up and getting ready in the mornings. Blaurock testified that he usually left the house around 6:45 or 7 a.m. at the same time as Johnathan, who was going to heating and air conditioning school. Blaurock's brother, Marty Blaurock, testified that he was at Blaurock's house every morning because he and Blaurock worked together. According to Marty, he never noticed any tension or problems between C.S. and Blaurock during May 2005.

According to Blaurock, C.S. had asked him several times about having her natural father murdered. Johnathan testified that C.S. had also asked him many times if he would kill her father. Marty Blaurock testified that he had overheard C.S. say that she wanted her father dead. C.S. testified, however, that she had never asked Blaurock or Johnathan to kill her father.

Blaurock further testified that he and Tammy had been having problems in their relationship during April and the first part of May 2005. Blaurock stated that he and Tammy were in the process of ending their relationship in May 2005. Nevertheless, Blaurock testified that he and Tammy had been having sex nearly every day between May 25 and June 1, 2005, and that he had never used a condom. Marty testified that Blaurock and Tammy were not getting along and that Tammy understood Blaurock was going to leave her.

Blaurock testified that his relationship with C.S. had been rough. According to Blaurock, C.S. had a lot of friends of which he did not approve, including her friend Derek. Blaurock testified that he had thrown Derek out of the house during April or the first part of May 2005 when C.S. did not want Derek to leave. Blaurock stated that he had tapped Derek on the shoulder and head with his foot and that he had verbally insulted Derek. Blaurock testified that he had been to Derek's house before June 1, 2005, asking Derek's mother and grandmother to keep Derek away from C.S.

According to Johnathan, C.S. said she hated Blaurock because he would not let her see Derek anymore.

Blaurock testified that when the police came to the house on June 1, 2005, he thought they were there based on the incident with Derek. Blaurock testified that when he arrived home on the afternoon of June 1, 2005, he saw the police at the end of the street but did not hear anything as he was walking into the house or after he was inside the house. Blaurock testified that he has hearing loss in both ears. According to Blaurock, he walked out of the side door because he had noticed Tammy's car in the driveway, and he was going to look for her in the backyard. Blaurock testified that his statement to police, "Do you have any suggestions for life after this?" was made because he thought he was being arrested for assaulting Derek.

*DNA Evidence*

Barbara Crim-Swanson, a forensic biologist with the Kansas Bureau of Investigation (KBI) lab, testified that semen was identified on the vaginal swabs taken from C.S. during her exam at the University of Kansas Medical Center. The level of semen on the swabs indicated that sexual intercourse had taken place within 24 to 36 hours. Crim-Swanson testified that the major component of the mixed DNA profile on the vaginal swab was consistent with the DNA profile of Blaurock. The estimated frequency of that major component of the mixed DNA profile obtained from biological material occurring at random in the unrelated general Caucasian population was 1 in 67 quadrillion. As a result, Blaurock could not be excluded as a possible contributor of the major component of the mixed DNA profile.

Moreover, Crim-Swanson examined the DNA found in the two pairs of underwear collected from C.S. The DNA found in the underwear recovered from C.S.'s house on June 2, 2005, matched Blaurock's DNA in all 13 areas of DNA that were typed. In addition, the major component of the mixed DNA profile found in the underwear that C.S. wore to the hospital on June 1, 2005, was consistent with Blaurock's DNA profile.

After a 5-day trial, the jury found Blaurock guilty of rape from the May 25, 2005, incident; aggravated criminal sodomy from the June 1, 2005, incident; and sexual exploitation of a child from the June 1, 2005, incident.

*I. Did the trial court err in admitting evidence of Blaurock's prior crimes?*

First, Blaurock argues that the trial court erred in admitting evidence of his prior crimes, which consisted of both the conviction and the acquittals from his first trial.

When reviewing a trial court's decision to admit evidence, an appellate court first determines whether the evidence is relevant. Relevant evidence is "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). Thus, the evidence, to be relevant, also must be material. *State v. Reid,* 286 Kan. 494, Syl. ¶ 1, 186 P.3d 713 (2008). The standard of review of whether evidence is material is de novo. *Reid,* 286 Kan. at 505. The standard of review of whether the evidence is probative in the particular cases is reviewed under the abuse of discretion standard. *Reid,* 286 Kan. at 509. Finally, even if evidence is material and probative, the trial court must determine whether the evidence is unduly prejudicial. The appellate court reviews the determination of whether evidence is unduly prejudicial under the abuse of discretion standard. *Reid,* 286 Kan. at 509.

Here, before his second trial, Blaurock moved to exclude evidence of his conviction in the first trial for aggravated indecent liberties and evidence relating to the alleged sexual acts that occurred after April 30, 2005, and before May 25, 2005, of which he had been acquitted. Concerning the June 1, 2005, incident, Blaurock moved to prohibit the State's witnesses from testifying to any alleged sexual acts other than those encompassed in the aggravated criminal sodomy count. On the morning of his second trial, Blaurock also moved to exclude the DNA evidence from the alleged June 1, 2005, incident. This last motion was argued at the beginning of the second day of trial. The trial court denied Blaurock's motions in limine and allowed the evidence to be admitted.

At trial, the State presented testimony from C.S. about the sexual intercourse that occurred between her and Blaurock on June 1, 2005. In addition, Officer Pena, as well as the nurse and doctor at the hospital, testified about C.S.'s description of the June 1, 2005, sexual intercourse. Moreover, Officer Pena and D.P. testified that C.S. had said that Blaurock had "raped" her on June 1, 2005. Further, the State introduced the results of the DNA evidence recovered from the vaginal swabs and C.S.'s underwear after the June 1, 2005, incident.

Concerning the May 25, 2005, incident, the State presented a photograph of an adult male performing sodomy on a young female, which was not part of the subject criminal charges. Concerning the sexual acts that occurred after April 30, 2005, and before May 25, 2005, the State presented testimony from C.S. C.S.'s testimony about the sexual acts occurring during that time period was vague, with C.S. recounting only one specific incident when she and Blaurock had had sexual intercourse three times in 1 day after Blaurock had told her that she was pregnant. Even concerning that particular incident, C.S.'s testimony was very brief and did not include where the incident took place or whether Blaurock used any violence during the incident. The State also presented a videotape of C.S.'s interview at the Sunflower House in which C.S. referred to the alleged sexual acts that occurred after April 30, 2005, and before May 25, 2005.

### A. Failure to make contemporaneous objection

When the other crimes evidence was presented to the jury, Blaurock failed to make a contemporaneous objection to the admission of the evidence. Moreover, Blaurock has failed to point to anywhere in the record where he made a continuing objection to the other crimes evidence. To preserve an issue relating to the admissibility of evidence for appeal, a party must make a timely and specific objection. K.S.A. 60-404. Even if there is an in limine ruling that the evidence is admissible, where an objection to the evidence is not made when it is introduced at trial, the defendant is generally precluded from challenging its admissibility on appeal. See *State v. Carapezza*, 286 Kan. 992, Syl. ¶ 7, 191 P.3d 256 (2008)

(where defendant objected to evidence only on hearsay grounds, she failed to preserve for appeal the issue of the inadmissibility of the evidence under K.S.A. 60-455); *State v. Francis,* 282 Kan. 120, 138, 145 P.3d 48 (2006) (where defendant failed to object at trial to the admission of evidence under K.S.A. 60-455, he was precluded from raising the issue on appeal); *State v. Young,* 14 Kan. App. 2d 21, 37, 784 P.2d 366, *rev. denied* 245 Kan. 788 (1989) (To preserve a K.S.A. 60-455 issue for appeal, a defendant must object on that ground at trial.). Blaurock, by failing to object, waived any challenge to the trial court's admission of the other crimes evidence. As a result, consideration of Blaurock's argument concerning the erroneous admission of evidence is precluded by his failure to make a contemporaneous objection. Nevertheless, even if Blaurock had preserved this issue for appeal, his argument would still fail based on the following analysis.

*B. Admissibility of other crimes evidence under State v. McHenry*

In denying Blaurock's motions in limine to exclude the prior crimes evidence, the trial court held that the evidence was relevant to show a continuing course of conduct between Blaurock and C.S. In *State v. McHenry,* 276 Kan. 513, 78 P.3d 403 (2003), our Supreme Court held that the admission of other crimes and civil wrongs evidence could be admitted independent of K.S.A. 60-455 to show a continuing course of conduct between an adult defendant and a child victim. Citing *State v. Crossman,* 229 Kan. 384, 387, 624 P.2d 461 (1981), our Supreme Court stated:

" 'In cases of crimes involving illicit sexual relations or acts between an adult and a child, evidence of prior acts of similar nature between the same parties is admissible independent of K.S.A. 60-455 where the evidence is not offered for the purpose of proving distinct offenses, but rather to establish the relationship of the parties, the existence of a continuing course of conduct between the parties, or to corroborate the testimony of the complaining witness to the act charged.' " 276 Kan. at 520.

*C. Analysis under State v. Gunby*

Nevertheless, in *State v. Gunby,* 282 Kan. 39, 57, 144 P.3d 647 (2006), our Supreme Court held that "any and all other crimes and

civil wrongs" evidence would be subject to K.S.A. 60-455. K.S.A. 60-455 states:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit [a] crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Under the plain and unambiguous language of K.S.A. 60-455, evidence of prior crimes or civil wrongs cannot be admitted to prove a criminal defendant's propensity to commit the charged crime, but it can be "admissible when relevant to prove some other material fact." *Gunby*, 282 Kan. at 48.

One of our Supreme Court's most recent cases focusing on K.S.A. 60-455 evidence is *Reid*, 286 Kan. 494. In *Reid*, our Supreme Court clarified the analysis to be applied to K.S.A. 60-455 evidence:

"[T]he K.S.A. 60-455 analysis requires several steps. . . . [T]he court must determine that the evidence is relevant to prove a material fact, *e.g.*, motive, knowledge, and identity. The court must also determine that the material fact is disputed. Additionally, the court must determine that the probative value of the evidence outweighs the potential for producing undue prejudice. Finally, the court must give a limiting instruction informing the jury of the specific purpose for admission whenever 60-455 evidence comes in. [Citations omitted.] As we explained in [*State v.*] *Gunby*, [282 Kan. 39, 48, 144 P.3d 647 (2006)]: 'These safeguards are designed to eliminate the danger that the evidence will be considered to prove the defendant's mere propensity to commit the charged crime.' [Citation omitted.]" 286 Kan. at 503.

In *Gunby*, our Supreme Court, citing *McHenry*, recognized that it had previously approved of the admission of other crimes and civil wrongs evidence, involving illicit sexual relations between an adult and a child, independent of K.S.A. 60-455 to show a continuing course of conduct on a defendant's part. 282 Kan. at 56. The *Gunby* court also discussed other bases on which it had previously admitted other crimes and civil wrongs evidence independent of K.S.A. 60-455. Determining that other crimes and civil wrongs ev-

idence would no longer be admissible independent of K.S.A. 60-455, however, our Supreme Court stated:

> "Our increasingly elastic approach to the admission of evidence of other crimes and civil wrongs is overdue for correction, as are the two problems that gave rise to the practice of admitting such evidence independent of K.S.A. 60-455.
>
> "We hereby state unequivocally that the list of material facts in K.S.A. 60-455 is exemplary rather than exclusive. It may be that other crimes and civil wrongs evidence is relevant and admissible to prove a material fact other than the eight listed. Should this be a district judge's determination; however, the evidence must be subjected to the same sort of explicit relevance inquiries, particularized weighing of probative value and prejudicial effect, and prophylactic limiting instruction we have required when any other K.S.A. 60-455 evidence is admitted.
>
> "This enables our return to sensible application of K.S.A. 60-455 and puts an end to the practice of admission of other crimes and civil wrongs evidence independent of it. It recognizes that the list in the statute has always been inclusive rather than exclusive, and that the several ways around application of and safeguards attendant to K.S.A. 60-455 must be abandoned, not only because they lack reliable precedent but because they were never necessary in the first place. Other crimes and civil wrongs evidence that passes the relevance and prejudice tests we have set up and is accompanied by an appropriate limiting instruction should always have been admissible, even if the particular material fact on which it was probative was not explicitly set forth in the statute. It never actually required a specially designed rule to admit it independent of the statute. Rather, such evidence, if permitted to do so, would have fallen squarely within it. We disapprove any language to the contrary in our previous opinions. *Henceforth, admissibility of any and all other crimes and civil wrongs evidence will be governed by K.S.A. 60-455.*" (Emphasis added.) 282 Kan. at 56-57.

Thus, under *Gunby*, all other crimes evidence must be analyzed under K.S.A. 60-455 to determine whether the evidence is admissible.

Recently, in *State v. Vasquez*, 287 Kan. 40, 50, 194 P.3d 563 (2008), our Supreme Court held that *Gunby* applies to a case that was on direct appeal when *Gunby* was filed. *Gunby* was filed on October 17, 2006. Because the instant case was on direct appeal when *Gunby* was filed, the analysis in *Gunby* applies here.

Although *Gunby* might have ended the type of analysis independent of K.S.A. 60-455 that was done in previous cases, it did not necessarily change the result as long as the proper analysis is performed. As set forth previously, this analysis requires a court to determine that the evidence is relevant to prove a material fact;

that the fact is disputed; that the evidence is more probative than prejudicial; and that an appropriate limiting instruction is given. Here, the trial court never performed that particular analysis in admitting the other crimes evidence. Nevertheless, the *Gunby* court recognized that even if those steps are not performed, the error may be harmless: "We explicitly recognize that the admission of K.S.A. 60-455 evidence without the explicit relevance inquiries, particularized weighing of probative value and prejudicial effect, or prophylactic limiting instruction is not inevitably so prejudicial as to require automatic reversal. On the contrary it may be harmless." 282 Kan. at 57.

Our analysis now shifts to whether the other crimes evidence was relevant to prove a material fact under K.S.A. 60-455. In this case, the trial court held the evidence was admissible to prove a continuing course of conduct and the relationship of the parties. Neither of those factors are explicitly listed in K.S.A. 60-455. *Gunby* clarified, however, that the list of material facts in K.S.A. 60-455 is exemplary rather than exclusive.

Nevertheless, the State does not argue that "continuing course of conduct" and "relationship of the parties" are still viable material facts under a K.S.A. 60-455 analysis. Moreover, since *Gunby*, our Supreme Court has not recognized "continuing course of conduct" and "relationship of the parties" as material facts under a K.S.A. 60-455 analysis. In fact, in *State v. Warledo*, 286 Kan. 927, 941, 190 P.3d 937 (2008), our Supreme Court recently recognized that the trial court's rationale for admitting other crimes evidence to show "relationship of the parties" was improper:

"At the time of Warledo's trial, evidence was admissible independent of K.S.A. 60-455 for the purpose of showing the relationship of the parties and did not require a limiting instruction. [Citations omitted.] In *Gunby*, 282 Kan. at 57, this court explicitly abolished this exception, holding that the admission of all evidence of other crimes and civil wrongs must be analyzed under K.S.A. 60-455. Hence, to the extent the trial court reasoned the [other crimes] evidence . . . [was] admissible to show the relationship between Warledo and his mother, such rationale was improper." 286 Kan. at 942.

Importantly, *Warledo* is factually distinguishable from this case in that the other crimes evidence in *Warledo* related to violence by

the defendant against his mother (the victim), which involved discordant relationship-type evidence. On the other hand, the other crimes evidence in this case related to illicit sexual relations between an adult defendant and a child victim. Nevertheless, under the broad statement in *Warledo,* it would seem that this type of evidence is no longer admissible to show "relationship of the parties."

Currently, there appears to be no case by our Supreme Court that has yet recognized the admission of other crimes evidence based on a material fact not explicitly set forth in K.S.A. 60-455. In *State v. Warledo,* 286 Kan. at 941 (2008), our Supreme Court stated: "[A]pplication of K.S.A. 60-455 requires determination of whether the evidence relates to a prior crime or civil wrong and, if so, *whether it is admitted solely to prove propensity* or whether it is relevant to prove some material fact other than propensity. See *Gunby,* 282 Kan. at 48." (Emphasis added.) In *McHenry,* our Supreme Court explained why the nonpropensity uses of ongoing sexual misconduct were relevant in crimes involving illicit sexual relations or acts between an adult and child. Because the evidence regarded the same victim in *McHenry,* it did not rely on the general propensity inference prohibited by K.S.A. 60-455. Instead, the evidence was relevant to show the timing of the past complaint in the context of other family dynamics at the time and was also relevant to show why the child victim had not come forward and why past complaints had not resulted in action by those in authority. 276 Kan. at 521. See 3 Barbara, Kansas Law and Practice, Lawyer's Guide to Evidence § 5:6 (5th ed. 2007) (recognizing that the *McHenry* court explained the "nonpropensity" uses of other crimes evidence between an adult defendant and a child victim).

It would be an interesting question whether other crimes evidence, in cases involving illicit sexual relations between an adult defendant and a child victim, would be admissible to show corroboration of the child victim. One of the reasons given by the *McHenry* court for admission of other crimes evidence in cases involving illicit sexual relations or acts between an adult and a child was " 'to corroborate the testimony of the complaining witness to the act charged.' " 276 Kan. at 520. In cases where the adult de-

fendant challenges the child victim's failure to immediately report as part of the defense that the child victim made up the allegations, it seems that the State should be able to counteract this defense by presenting evidence showing why the victim would not have immediately reported and corroborating the child victim's testimony. It appears that such evidence would more appropriately come in during rebuttal, once the defendant has challenged the child victim's credibility and failure to immediately report.

In the instant case, part of Blaurock's defense was to challenge the veracity of C.S. During cross-examination of the State's witnesses at trial, Blaurock highlighted the fact that C.S. had not immediately reported the alleged sexual abuse. Blaurock's defense was that C.S. had made up the allegations, possibly with Tammy's help, for spite or to get him out of the picture. By presenting evidence that C.S. had failed to report the sexual acts immediately, Blaurock was arguing either directly or indirectly that the crime never occurred or that C.S. should not be believed in some or all of her testimony. Based on Blaurock's defense, the other crimes evidence, particularly the DNA evidence and the picture depicting an adult male, would corroborate C.S.'s testimony. Nevertheless, because our Supreme Court since *Gunby* has never approved the admission of K.S.A. 60-455 evidence on the ground that it is relevant to show corroboration of the child victim, we make no decision on this basis.

### D. Identity

#### 1. Other Crimes Evidence From the May 25, 2005, and June 1, 2005, Incidents

#### a. Relevance, Probativeness, and Materiality

Nevertheless, it is unnecessary to determine whether the other crimes evidence in this case was admissible to prove a fact not specifically listed under K.S.A. 60-455. That is because the trial court easily could have found a legal basis for admitting the evidence to show "identity" under K.S.A. 60-455. Although the trial court did not rely on identity under K.S.A. 60-455 in admitting the other crimes evidence, this court can affirm the trial court's decision on that ground. If a trial court reaches the right result, its

decision will be upheld even though the trial court relied upon the wrong ground or assigned erroneous reasons for its decision. The reason given by the trial court for its ruling is immaterial if the result is correct. *State v. Murray*, 285 Kan. 503, 533, 174 P.3d 407 (2008). In *Reid*, 286 Kan. 494, Syl. ¶ 7, our Supreme Court recognized that a trial court's decision to admit evidence under K.S.A. 60-455 will not be reversed if it was right, but for the wrong reason.

Blaurock's identity as the perpetrator of the crimes and as the man depicted in the pictures from the June 1, 2005, incident was crucial to the State's case in the second trial. Blaurock placed his identity in issue when he took the stand at both trials and denied that he was the perpetrator of the sexual acts. The State had presented testimony from C.S. about the alleged sexual acts. In addition, the State had presented the jury with pictures of C.S. and a male engaged in sexual misconduct. C.S. had identified Blaurock as the perpetrator of the crimes and as the man in the pictures. In addition, C.S.'s mother had identified Blaurock as the man in the pictures. During his testimony, however, Blaurock denied that he had engaged in sexual misconduct with C.S. and that he was the man in the pictures with C.S. Blaurock went so far as to testify about a hernia in his pelvic area, which the man in the pictures did not appear to have. Moreover, much of Blaurock's testimony indicated that he had not even been home when the alleged sexual misconduct acts had occurred. Finally, Blaurock testified that he was lying when he admitted in his letters that he had had sexual intercourse with C.S. As a result, Blaurock's identity as the perpetrator of the crimes was a disputed material fact in the case.

The other crimes evidence from the May 25, 2005, incident and the June 1, 2005, incidents that was introduced by the State was relevant to prove Blaurock's identity as the perpetrator of the crimes. Specifically, the sodomy picture from the May 25, 2005, incident showed a portion of a man's face and hair, which would have been relevant to the jury's determination as to whether Blaurock was the person depicted in the picture committing the alleged sexual misconduct with C.S. Additionally, the DNA evidence recovered from C.S. and the underwear she wore on June 1, 2005, were also relevant to prove Blaurock's identity as the perpetrator

of the alleged crimes. Consequently, the other crimes evidence was relevant and had a logical connection to a material disputed fact in the case: Was it Blaurock or some other male engaged in sexual misconduct with C.S.?

The instant case is analogous to *State v. Johnson*, 222 Kan. 465, 469, 565 P.2d 993 (1977), and *State v. Henson*, 221 Kan. 635, 562 P.2d 51 (1977). In *Johnson*, the appellant contended that the identity of the murderer was not an issue in the case. As a result, a witness' testimony was inadmissible under K.S.A. 60-455. The witness' testimony had been offered and admitted to prove identity. The appellant argued that identity was not at issue because he admitted being at the scene and saw another man attacking the victim.

In addressing the appellant's argument, our Supreme Court looked to its earlier decision in *Henson*, where it had considered the same issue. In *Henson*, the defendant admitted being in the apartment when the female victim was murdered and testified that he went to the apartment to sell drugs to someone else. The defendant testified that when he arrived, the individual to whom he was selling drugs was not there, and the naked body of the victim was lying on a bed in the apartment. Identity was held to be substantially at issue in *Henson*. Our Supreme Court similarly held that identity was in issue in *Johnson* where the appellant identified someone else as the murderer and denied the charges by the State. 222 Kan. at 469-70.

What our Supreme Court said in *Johnson* and *Henson* applies equally to this case. Although Blaurock had been present in C.S.'s home on May 25, 2005, and June 1, 2005, he maintained that he was not the one who had engaged in sexual misconduct with C.S. Blaurock alleged that he had suspected C.S. was having sex with "Derek" or another boy after examining her underwear. Analogizing *Johnson* and *Henson* to this case, we determine that identity was substantially in issue here where Blaurock identified someone else as engaging in sexual intercourse with C.S. and denied the charges filed against him.

Important to this analysis, our Supreme Court has held that in order for other crimes evidence to be admitted to show identity,

the crimes must be similar in nature. Citing *State v. Blackmore*, 249 Kan. 668, Syl. ¶ 4, 822 P.2d 49 (1991), our Supreme Court in *State v. Higgenbotham*, 271 Kan. 582, 589, 23 P.3d 874 (2001), stated:

" 'Where a prior conviction is offered for the purpose of proving identity, the evidence should disclose sufficient facts and circumstances of the offense to raise a reasonable inference that the defendant committed both offenses. Similarity must be shown in order to establish relevancy. It is not sufficient simply to show that the offenses were violations of the same or similar statutes; there should be some evidence of the underlying facts showing the manner in which the other offense was committed so as to raise a reasonable inference that the same person committed both offenses. However, the prior offenses need only be similar, not identical, in nature.' "

The other crimes evidence was sufficiently similar to the charged crimes to be admissible. All of the crimes were between Blaurock and C.S. The crimes always occurred during the week, and Blaurock waited to commit the crimes until after Tammy left for work in the morning. Moreover, part of the other crimes evidence was from the incidents on May 25, 2005, and June 1, 2005. The crimes that occurred on May 25, 2005, and June 1, 2005, involved sexual intercourse and then sodomy, took place in Blaurock's bedroom, and involved photographing the sexual acts. Due to the similar nature of the crimes, the evidence was relevant to show identity.

### b.  *Probative v. Prejudicial*

There is no question that the other crimes evidence from May 25, 2005, and June 1, 2005, was prejudicial to Blaurock. The other crimes evidence established his identity as the perpetrator of the crimes against C.S. Recently, in *State v. Prine*, 287 Kan. 713, 200 P.3d 1 (2009), our Supreme Court stated that it is not concerned "with the garden-variety prejudice necessary for any successful prosecution. We are concerned only with undue or unfair prejudice. [Citation omitted.]" The record in this case demonstrates that no undue prejudice resulted from the admission of the other crimes evidence.

As set forth previously, the other crimes evidence from May 25, 2005, and June 1, 2005, was probative to establish identity. Part of Blaurock's defense in the case was that C.S., along with possibly

her mother's help, had set him up and had falsely implicated him as the perpetrator of the alleged crimes. Moreover, Blaurock denied that he was the man in the pictures engaged in sexual misconduct with C.S. With this defense, the DNA evidence from the June 1, 2005, incident and the picture from the May 25, 2005, incident became key to establishing that Blaurock was the person who had committed the alleged crimes in this case. Any prejudicial effect was outweighed by the probative value of the other crimes evidence.

### c. Limiting Instruction

The trial court did give a limiting instruction to the jury in this case. Although there was no specific limiting instruction given on identity, it is apparent that the trial court's failure to anticipate and utilize the *Gunby* analysis was harmless error. The evidence against Blaurock was substantial, including his own admission in the letters that he had engaged in sexual misconduct with C.S. and the pictures that were hidden in C.S.'s garage. The jury was instructed to limit its consideration of the evidence. We conclude that any error in the introduction of the other crimes evidence was harmless.

### 2. Other Crimes Evidence From Incidents Occurring After April 30, 2005, and Before May 25, 2005

We acknowledge that the State also introduced testimony from C.S. about the incidents that occurred after April 30, 2005, and before May 25, 2005, which does not appear to be relevant to show identity. Nevertheless, this evidence was limited and vague. C.S. provided very few details about those incidents and only discussed one particular incident when Blaurock had told her that she was pregnant. Even regarding the one particular incident, C.S. did not testify about where the incident occurred or on what day the incident occurred. Based on the overwhelming evidence against Blaurock, which included the DNA evidence, the pictures, and his admissions in his letters, any erroneous introduction of the other crimes evidence that occurred after April 30, 2005, and before May 25, 2005, was harmless.

*E. Plan*

Finally, the trial court could have also found a legal basis for admitting the other crimes evidence to show "plan" under K.S.A. 60-455. As discussed in *State v. Damewood*, 245 Kan. 676, 681-83, 783 P.2d 1249 (1989), the concept of plan under K.S.A. 60-455 may relate to one of two theories. Under the first theory, the other crimes evidence is admissible "to show the modus operandi or general method used by a defendant to perpetrate similar but totally unrelated crimes." 245 Kan. at 681-82. The rationale for admitting other crimes evidence to show plan under K.S.A. 60-455 is that "the method of committing the prior acts is so similar to that utilized in the case being tried that it is reasonable to conclude the same individual committed both acts." 245 Kan. at 682. Our Supreme Court recently held that before a trial court admits evidence of prior bad acts to prove plan or modus operandi under K.S.A. 60-455, "the evidence must be so strikingly similar in pattern or so distinct in method of operation to the current allegations as to be a signature." *Prine*, 287 Kan. 713, Syl. ¶ 6.

Our Supreme Court in *Prine* recognized that it has consistently recited two theories for the admission of K.S.A. 60-455 evidence to prove plan. Our Supreme Court has previously recognized that under the second theory, the other crimes evidence is admissible to show plan under K.S.A. 60-455 "where there is some direct or causal connection between the prior conduct and the crimes charged. [Citations omitted.]" 245 Kan. at 682-83. In other words, the other crimes evidence must show "some causal connection between the two offenses, so that proof of the prior offense could be said to evidence a preexisting design, plan or scheme directed toward the doing of the offense charged." *State v. Marquez*, 222 Kan. 441, 446-47, 565 P.2d 245 (1977).

*1. Relevance, Probativeness, and Materiality*

Under the first theory, the other crimes evidence from the May 25, 2005, incident and the June 1, 2005, incidents was relevant to show the general method used by Blaurock to commit the crimes. As set forth in our discussion on "identity" earlier, the May 25, 2005, and June 1, 2005, crimes were strikingly similar in that they

were between Blaurock and C.S.; they occurred on a weekday after Tammy had gone to work; they involved sexual intercourse and then sodomy; they were committed in Blaurock's bedroom; and they involved photographing the sexual acts. Based on the record in this case, we determine that the method of committing the crimes was so strikingly similar in pattern to that utilized in the charged crimes that it constituted a signature. As a result, it was reasonable to conclude that the same individual committed all of the acts.

Moreover, the other crimes evidence from the sexual acts occurring after April 30, 2005, and before May 25, 2005, and the evidence from the particular incidents occurring on May 25, 2005, and June 1, 2005, would also be admissible to show plan under the second theory set forth previously. The only particular incident occurring between April 30, 2005, and before May 25, 2005, was the incident with the little white pills when Blaurock had told C.S. that she was pregnant. This evidence, along with the rest of the other crimes evidence, showed that Blaurock had developed a scheme to gain control over C.S. through progression: by isolating her from her friends and family, by developing a system of threats and rewards, by gradually introducing sodomy to the sexual acts committed, and by later taking pictures of the sexual misconduct. See *State v. Fabian*, 204 Kan. 237, 238, 461 P.2d 799 (1969) (Evidence of previous crimes was properly admitted to show a preconceived "creeping" plan to steal from a series of stores.). Stated another way, the other crimes evidence showed a step-by-step plan by Blaurock to break down C.S.'s resistance to engage in acts of sodomy and to allow the sexual acts to be photographed.

Blaurock placed this material fact of "plan" in issue when he denied sexually abusing C.S. Moreover, Blaurock's testimony indicated that he did not have the opportunity to commit the alleged acts, that he had not threatened or isolated C.S. but had tried to be a good father figure to her, and that the gifts he had given her were done out of fatherly affection. Based on the appellate record in this case, we determine that the other crimes evidence was relevant to prove the disputed, material fact of plan under K.S.A. 60-455.

### 2. Probative v. Prejudicial

We move next to the balancing of probative value versus prejudicial effect. Under this part of the test, it is not enough that the evidence was prejudicial to Blaurock. In any criminal case, evidence introduced by the State will usually be prejudicial to a defendant. In order to be excluded under this step of the test, the unfair or undue prejudice arising from the admission of the evidence must substantially outweigh its probative value. See *State v. Vasquez*, 287 Kan. 40, 49, 194 P.3d 563 (2008). As set forth previously, the other crimes evidence introduced in this case was probative to show plan. Based on Blaurock's defense of challenging C.S.'s veracity in this case, the evidence was necessary to show that Blaurock committed the acts in question and also to show Blaurock's preexisting scheme to get C.S. to engage in the ongoing sexual abuse.

Moreover, even without the facts of the other crimes, the evidence against Blaurock was substantial. The facts submitted to the jury included the Sunflower House videotaped interview and testimony from C.S., C.S.'s mother, the examining nurse, and the interviewing detective. C.S. consistently identified Blaurock as the perpetrator of the sexual abuse and described the incidents that occurred between her and Blaurock. When the police attempted to contact Blaurock after C.S. reported the June 1, 2005, incident, Blaurock ran inside the house, locked the door, and attempted to leave out of a side door. After he was arrested, Blaurock asked whether the officer had any suggestions for life after this. Later, pictures of C.S. engaged in the sexual acts that she described were found hidden in the garage. In light of the substantial evidence against Blaurock and of the relevance of the evidence to show plan, any prejudicial effect of the other crimes evidence was outweighed by its probative value.

### 3. Limiting Instruction

As discussed previously, the trial court did give a limiting instruction to the jury in this case. Here, the trial court instructed the jury that it could consider the other crimes evidence only "for the purpose of establishing the relationship of the parties and the existence

of a continuing course of conduct." This same instruction was given in *State v. Elrod*, 38 Kan. App. 2d 453, 462, 166 P.3d 1067 (2007), *rev. denied* 285 Kan. 1175 (2008), where this court stated that generally, "we believe limiting instructions such as this cure any error in the admission of the evidence."

Although there was no specific limiting instruction given on plan, the trial court's failure to anticipate and utilize the *State v. Gunby*, 282 Kan. 39, 57, 144 P.3d 647 (2006), analysis was harmless error under the facts of this case. The evidence against Blaurock was substantial, including his own admission in the letters that he had engaged in sexual misconduct with C.S. and the pictures that were hidden in C.S.'s garage. The jury was instructed to limit its consideration of the evidence. We conclude that any error in the introduction of the other crimes evidence was harmless.

*II. Did the trial court err in allowing an unredacted videotape to be given to the jury?*

Next, Blaurock argues that the trial court erred in allowing the videotape of C.S.'s Sunflower House interview to be sent into the jury room without redacting the reference to Blaurock's federal parole status.

When the Sunflower House interview videotape was introduced into evidence at the first trial, Blaurock failed to make a contemporaneous objection requesting redaction of the reference to his federal parole status. Moreover, Blaurock points to nowhere in the record where he requested redaction of the videotape to remove the reference to his federal parole status before the jury retired for deliberations.

Before his second trial, Blaurock filed a motion in limine in which he pointed out that he was currently on parole for possession of counterfeit cash, that he had previously been convicted of conspiracy to distribute marijuana, and that he had been found guilty of indecent liberties with a child at his first trial. Blaurock requested that the trial court exclude evidence of his prior convictions and his criminal history. Blaurock, however, failed to point out that the Sunflower House interview videotape contained a reference to his federal parole status. Moreover, he did not request

redaction of the videotape to remove the reference to his federal parole status.

Blaurock later filed a second motion in limine in which he asked the trial court to order that the Sunflower House interview videotape be redacted to remove any mention of the *alleged acts that occurred after April 30, 2005, and before May 25, 2005*. Again, Blaurock failed to argue that the videotape should be redacted to remove reference to his federal parole status. Similarly, at the hearing on Blaurock's motions in limine, Blaurock never requested redaction of the videotape to remove any reference to his federal parole status. Instead, Blaurock maintained that the videotape should be redacted to eliminate reference to the alleged acts that occurred after April 30, 2005, and before May 25, 2005.

In rejecting Blaurock's argument concerning redaction of the alleged acts that occurred after April 30, 2005, and before May 25, 2005, the trial judge stated "I don't think we can go into the videotape and cut everything out, and then all of a sudden, the first time there was ever anything between us was on May 25. I don't know how you can do that." The trial judge further stated that "I don't really think that we can be slicing it up to take out individual things." The trial court then asked whether there was anything in the videotape that had to be excluded in the first trial. The State responded that there was a reference to his federal parole status at the end of the videotape and that the videotape had been stopped at the first trial before the reference had been made. There was no objection at that point to the procedure used by the State in stopping the videotape.

Apparently, when the videotape was played to the jury at the second trial, it appears that the State did not play the portion of the videotape where reference was made to Blaurock's federal parole status. Indeed, the parties acknowledge that the portion of the videotape in which reference was made to Blaurock's federal parole status was never played to the jury at trial. Blaurock did not object to the State's procedure in stopping the tape before reference was made to his federal parole status. Blaurock made no contemporaneous objection that the tape be redacted to remove reference to

his federal parole status. Moreover, no such objection was made before the jury retired for deliberations in the second trial.

Although Blaurock alleges that the trial court allowed the entire videotape to go into the jury room, the record on appeal does not support his assertion. Blaurock has not come forward with any evidence to show that the Sunflower House videotape was taken into the jury room during deliberations. On the other hand, the record contains a court reporter's exhibit list that was created at the time of the second trial in this case. The exhibit list contains a handwritten note "did not go to jury room" beside the listing for the Sunflower House videotape. Blaurock has provided nothing in the record that would show otherwise. As the appellant, Blaurock had the burden to designate a record sufficient to show his claimed error. Without such a record, his claim of alleged error fails. See *State v. Paul*, 285 Kan. 658, 670, 175 P.3d 840 (2008).

More important, Blaurock's failure to ask the trial court for redaction of the videotape precludes appellate review of this issue. See *State v. Anthony*, 282 Kan. 201, 212-14, 145 P.3d 1 (2006) (holding that challenge to trial court's failure to redact interrogation videotape to remove references to defendant's lack of veracity requires preservation of issue at trial). "A party must make a timely and specific objection to the admission of evidence at trial in order to preserve the issue for appeal. [Citation omitted.] Issues not raised before the trial court may not be raised on appeal. [Citation omitted.]" *Anthony*, 282 Kan. at 206. As a result, Blaurock's argument that the tape should have been redacted before it was admitted into evidence and given to the jury is not properly before this court.

Because Blaurock failed to request redaction of the videotape at the trial court level, it is unnecessary to address Blaurock's alternative argument that the trial court erred in failing to give a limiting instruction to the jury concerning his federal parole status.

*III. Was Blaurock's statutory right to a speedy trial violated?*

Next, Blaurock asserts that the State violated his right to a speedy trial when it failed to bring him to trial within 90 days under K.S.A. 22-3402. The question of whether there was a violation of a de-

fendant's statutory right to a speedy trial is a matter of law over which an appellate court exercises a de novo standard of review. *State v. Mitchell*, 285 Kan. 1070, 1080, 179 P.3d 394 (2008).

Moreover, Blaurock's argument requires interpretation of K.S.A. 22-3402. Interpretation of a statute presents a question of law over which an appellate court has unlimited review. *State v. Storey*, 286 Kan. 7, 9-10, 179 P.3d 1137 (2008). The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *Winnebago Tribe of Nebraska v. Kline*, 283 Kan. 64, 77, 150 P.3d 892 (2007). An appellate court's first task is to "ascertain the legislature's intent through the statutory language it employs, giving ordinary words their ordinary meaning." *State v. Stallings*, 284 Kan. 741, 742, 163 P.3d 1232 (2007). When a statute is plain and unambiguous, an appellate court does not speculate as to the legislative intent behind it and will not read the statute to add something not readily found in it. *In re K.M.H.*, 285 Kan. 53, 79, 169 P.3d 1025 (2007).

The statutory right to a speedy trial is set forth in K.S.A. 22-3402, which states in pertinent part:

"(1) If any person charged with a crime and held in jail solely by reason thereof shall not be brought to trial within 90 days after such person's arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant, or a continuance shall be ordered by the court under subsection (5).

"(2) If any person charged with a crime and held to answer on an appearance bond shall not be brought to trial within 180 days after arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant, or a continuance shall be ordered by the court under subsection (5).

. . . .

"(5) The time for trial may be extended beyond the limitations of subsections (1) and (2) for any of the following reasons:

. . . .

(c) There is material evidence which is unavailable; that reasonable efforts have been made to procure such evidence; and that there are reasonable grounds to believe such evidence can be obtained and trial commenced within the next succeeding 90 days. Not more than one continuance may be granted the state on this ground, unless for good cause shown, where the original continuance was for less

than 90 days, and the trial is commenced within 120 days from the original trial date;

. . . .

"(6) In the event a mistrial is declared or a conviction is reversed on appeal to the supreme court or court of appeals, the time limitations provided for herein shall commence to run from the date the mistrial is declared or the date the mandate of the supreme court or court of appeals is filed in the district court."

The State bears the burden of ensuring that the defendant is provided with a speedy trial under K.S.A. 22-3402. A defendant is not required to take any affirmative action to ensure that the defendant's right to a speedy trial is observed. The defendant waives his or her statutory right to a speedy trial by requesting or acquiescing in the grant of a continuance. *State v. Adams*, 283 Kan. 365, 369, 153 P.3d 512 (2007).

The first trial in this case resulted in a mistrial on four counts due to a hung jury on December 2, 2005. See *State v. McClain*, 224 Kan. 464, 580 P.2d 1334 (1978) (applying K.S.A. 22-3402 and recognizing that mistrial occurs when jury fails to agree on verdict). The second trial was scheduled for February 13, 2006. The time between the mistrial and the scheduled second trial was 73 days. The State, however, moved to continue the case and argued that it needed additional time for analysis of the DNA evidence. The trial court granted the State's motion to continue and set the case for April 3, 2006. The second trial in this case began on April 3, 2006. The time between the mistrial and the second trial was 122 days.

Before the second trial, Blaurock moved to dismiss the charges against him due to the State's failure to bring him to trial within 90 days of the mistrial as required by K.S.A. 22-3402. At a hearing on Blaurock's motion to dismiss, the trial court noted that it had granted the State's motion for continuance due to the unavailability of the DNA evidence in time for trial. The trial court further noted that it also had considered the fact that Blaurock had already been convicted of one charge and was facing a 5-year prison sentence. Further explaining why it had granted the State's motion to continue, the trial judge stated:

"If all of these [current charges] had been dismissed, if they had been tried back there in February when they were set and the Defendant was acquitted, that

would have no effect on the thing that he was still serving. He was not being held solely on these pending charges, as is required for the 90-day speedy trial to kick in. And certainly that played a part in whether or not I granted the State's motion. It was for the basis of getting evidence that they did not have readily available, but the fact that the Defendant was going to be with us for a number of months on the other conviction very much played a part in that ruling."

Accordingly, the trial court denied Blaurock's motion to dismiss.

### A. Did the trial court erroneously consider Blaurock's conviction from his first trial?

Blaurock argues that the trial court, in finding no statutory speedy trial violation, erroneously looked to the fact that he had been convicted of one charge at the first trial. Blaurock cites *State v. Thuko*, No. 94,228, unpublished opinion filed January 12, 2007, *rev. denied* 284 Kan. 951 (2007), to support his argument. In *Thuko*, the State filed charges against the defendant in two criminal cases. The two cases were ultimately consolidated for trial. On appeal, this court rejected the defendant's argument that his statutory right to a speedy trial had been violated. This court held that the defendant's claim failed because the State had charged him with additional crimes in the second criminal case before the expiration of the 90-day period in K.S.A. 2005 Supp. 22-3402(1). Citing *State v. Mann*, 274 Kan. 670, 699, 56 P.3d 212 (2002), this court set forth the familiar rule that the statutory right to a speedy trial does not apply to defendants held in custody for any reason other than the subject criminal charge.

Blaurock contends that the *Thuko* panel's reliance on the *separate cases* pending indicates that those cases triggered the 180-day time period under K.S.A. 22-3402. Blaurock suggests that because he had no other pending cases, the State was required to bring him to trial within the 90-day period of K.S.A. 22-3402.

*Thuko* does not support Blaurock's argument. Blaurock has cited no authority to establish that the rule from *Mann* does not apply to the situation that is present in this case. Under the plain language of K.S.A. 22-3402(1), the 90-day statutory speedy trial requirement applies in those situations where a defendant is being held in jail "solely by reason" of *the charge* for which he or she is awaiting trial. Our Supreme Court in *Mann* clearly held "that the statutory

right to a speedy trial does not apply to criminal defendants who are held in custody for any reason other than *the subject criminal charge*. [Citation omitted.]" (Emphasis added.) 274 Kan. at 699-700. In listing the circumstances under which the statutory speedy trial right had been found to apply, the *Mann* court cited *State v. Ruff*, 266 Kan. 27, 31, 967 P.2d 742 (1998), where the defendant was incarcerated on a prior conviction at the time of arraignment and until trial. *Mann* also cited *State v. Strong*, 8 Kan. App. 2d 589, 593, 663 P.2d 668 (1983), where there were numerous other charges against the defendant and the defendant was convicted of a felony between arraignment and trial and was being held in custody pending his sentencing. Here, Blaurock had been convicted of the felony crime of aggravated indecent liberties with a child at his first trial and was facing a presumptive prison sentence. Blaurock was awaiting sentencing when the second trial occurred in this case. Because Blaurock was not being held in custody solely for the subject criminal charges in his second trial, he fell within the rule announced in *Mann*. As a result, Blaurock's statutory speedy trial rights were not violated.

The State maintains that Blaurock was also being held on a federal detainer from the District of Kansas for a parole violation. In *State v. Smith*, 271 Kan. 666, 682, 24 P.3d 727 (2001), our Supreme Court found that the statutory right to a speedy trial did not apply when the defendant was also being held on federal detainer. Moreover, in *State v. Abel*, 261 Kan. 331, 334, 932 P.2d 952 (1997), the statutory right to a speedy trial was found not to apply when the defendant was being held in jail for a parole violation. Nevertheless, while the record on appeal indicates that Blaurock was on federal parole, there is no evidence establishing that he was being held in jail for violation of his parole. At the hearing on Blaurock's motion to dismiss, the trial court noted that there was nothing in the record to support the State's assertion that Blaurock was being held in jail on a federal detainer. Without any evidence in the record showing that Blaurock was being held in jail for his parole violation between his first and second trial, this court cannot accept the State's argument.

*B. Did the trial court err in granting the State's motion for a continuance?*

Next, Blaurock contends that the trial court erred in granting the State's motion for a continuance between the first trial and the second trial to test DNA evidence. "K.S.A. 22-3401 provides a district court may grant a continuance 'for good cause shown,' and its refusal to grant a continuance will not be disturbed on appeal absent a showing of an abuse of discretion." *State v. Carter*, 284 Kan. 312, 318, 160 P.3d 457 (2007).

Blaurock argues that the continuance granted to the State in this case violated his statutory right to a speedy trial under K.S.A. 22-3402 because he was not brought to trial within 90 days. Nevertheless, as discussed previously, there was no violation of Blaurock's right to a speedy trial because he was also in custody awaiting sentencing for his felony conviction of aggravated indecent liberties with a child.

Moreover, under K.S.A. 22-3402(5)(c), the 90-day statutory speedy trial period of K.S.A. 22-3402(1) can be extended to 180 days when material evidence is unavailable; reasonable efforts have been made to procure such evidence; and there are reasonable grounds to believe the evidence can be obtained and the trial commenced within 90 days.

Here, in January 2006, the State moved to continue the trial set for February 6, 2006, and requested that it be given time to have the DNA evidence that was collected as part of the sexual exam kit analyzed. The State maintained that it had not had the DNA evidence analyzed before the first trial because it had recovered pictures of the crimes while they were being committed and letters that Blaurock had written about his behavior. The State contended that it was reasonable not to have the DNA analyzed before the first trial when there was significant additional evidence, including Blaurock's admission in his letters that he had been engaged in sexual intercourse with C.S.

Further, the State asserted that it had not intentionally delayed having the DNA analysis completed. According to the State, the Kansas Bureau of Investigation (KBI) lab in Wyandotte County

had only one individual to complete all of the DNA testing. The State maintained that it had been notified by the KBI that the vaginal swabs from C.S. had tested positive for seminal fluid and that the DNA analysis for the case could be completed by mid-March. The trial court granted the State a continuance in order to have the DNA evidence analyzed.

Blaurock argues that the State failed to prove that it had made reasonable efforts to procure the DNA evidence. Blaurock focuses on the fact that the State had possessed the DNA evidence before the first trial but had not had it analyzed until just before the scheduled second trial. Nevertheless, the trial court properly pointed out that the State had no obligation to bring DNA evidence forward at the first trial. Moreover, based on the pictures recovered from C.S.'s residence and Blaurock's letters in which he admitted to sexual misconduct with C.S., it was reasonable for the State to conserve its time and resources in not immediately pursuing DNA analysis.

Once Blaurock denied any sexual misconduct with C.S. and testified that he lied in his letters, it became apparent that the DNA evidence was needed to corroborate C.S.'s testimony. Nevertheless, it was too late to obtain the DNA evidence for the first trial. Blaurock maintains that the State made no attempt to process the DNA evidence immediately after the first trial. When the State moved for a continuance of the second trial, however, only 7 weeks had elapsed since the jury rendered its verdict in the first trial, and the State had already had some of the DNA evidence analyzed. This was in spite of the KBI lab having only one DNA analyst. Moreover, the State had ascertained that the analysis of the DNA evidence could be completed by mid-March and requested a continuance of less than 90 days.

Because the factors under K.S.A. 22-3402(5)(c) were met, the trial court was well within its discretion in granting the State's request for a continuance. There was no abuse of discretion in the trial court's decision. Accordingly, there was no speedy trial violation, and Blaurock's argument fails.

*IV. Was there cumulative error?*

Next, Blaurock argues that the combination of errors in this case deprived him of his right to a fair trial. Cumulative trial errors, when considered collectively, may be so great as to require reversal of a defendant's conviction. The test to be used is whether the totality of the circumstances prejudiced the defendant and denied him or her the right to a fair trial. No prejudicial error may be found under the cumulative effect rule when the evidence is overwhelming against a defendant. *State v. Nguyen,* 285 Kan. 418, 437, 172 P.3d 1165 (2007).

Here, because Blaurock has failed to show that error occurred in this case, his cumulative error argument fails. See *State v. Davis,* 283 Kan. 569, 583, 158 P.3d 317 (2007) (Cumulative error will not be found when the record fails to support the errors raised on appeal by the defendant.).

*V. Did the trial court err in using Blaurock's criminal history to increase his penalty?*

Finally, Blaurock argues that the trial court erred in using his criminal history to increase his penalty when the State failed prove his criminal history to a jury beyond a reasonable doubt. Blaurock concedes that our Supreme Court has decided this issue adversely to his position in *State v. Ivory,* 273 Kan. 44, 41 P.3d 781 (2002). Further, more recent decisions by our Supreme Court have affirmed *Ivory.* See *State v. Gonzalez,* 282 Kan. 73, 145 P.3d 18 (2006). This court is duty bound to follow our Supreme Court precedent, absent some indication the court is departing from its previous position. *State v. Merrills,* 37 Kan. App. 2d 81, 83, 149 P.3d 869, *rev. denied* 284 Kan. 949 (2007). Because there has been no indication that our Supreme Court is departing from its position in *Ivory,* we determine that the sentencing court properly considered Blaurock's criminal history in determining his sentence.

Affirmed.