No. 81,771

STATE OF KANSAS, *Appellee*, v. GEORGE LAMAE, *Appellant*.

(998 P.2d 106)

Opinion filed February 25, 2000.

*Patrick E. D'Arcy*, of Kansas City, argued the cause and was on the brief for appellant.

*Sheryl L. Lidtke*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: The defendant, George LaMae, was convicted of the manufacture of methamphetamine and first-degree felony murder. The case was severed from that of a codefendant, Thomas Finley, prior to trial. Both were convicted and sentenced. This is the appeal filed by LaMae. Finley's convictions were reversed by this court on today's date. See *State v. Finley*, No. 81,953, filed February 25, 2000.

The defendant asks this court to reverse his convictions based upon the following five reasons: (1) the failure of the trial court to suppress evidence or grant a new trial based on destruction of evidence; (2) the insufficiency of evidence based on the theory of impossibility; (3) the trial court's refusal to give a requested alternative instruction on felony murder; (4) the refusal of the trial court to instruct on ignorance or mistake; and (5) the merger of the charged drug offense with the death of the victim.

On October 1, 1997, the body of LaDonna Jones was found in an attic in Kansas City, Kansas, following a fire which extensively damaged the residence. Evidence was collected which suggested that the production of methamphetamine was the cause of the fire.

The defendant, after being taken into custody, signed a written confession. He stated that he and his girlfriend, the victim, went to the house of Tom Finley around 10:30 in the morning. He stated that he went to the house because he was in possession of a jar of a reddish-brown oil substance that was supposedly from a methadone cook. He took it to Finley because Finley would know how to finish producing it. Finley was working on a car and could not get to it at the time. The defendant stayed at Finley's house all day, although Jones left to go to work and then came back later.

Sometime after midnight that night, Finley, Jones, the defendant, and Finley's girlfriend Dee Sklar went to the attic to finish producing the methamphetamine. Also present in the house were a "skinny kid" and two other friends of Finley, Mike Quinn and Lonnie Joe Pugh. Quinn and Pugh were both asleep downstairs.

According to the defendant, Finley put some of the liquid in the jar in a glass dish and put the dish on a hot plate. Finley then sent

Sklar downstairs for some acetone, and he applied the acetone to the substance. Finley then poured the substances through a filter. The resulting mixture was not purely white and Finley told the defendant that this was because the acetone was not clean. Finley was repeating the process with more of the liquid when the electricity went off. Finley then tried heating the mixture with a propane torch. However, when he was attempting to run acetone through it, the mixture caught fire. Attempts to put out the fire with a shirt spread the burning mixture. The fire separated Finley, Sklar, and the defendant from Jones. Finley, Sklar, and the defendant escaped from the house but Jones did not. The defendant testified that he wandered through the yard calling Jones' name and then got into a truck driven by Pugh and drove off.

At trial, the State presented the testimony of Pugh. Pugh confirmed that he was living in Finley's house at the time of the incident and testified that he was sleeping in his room when he heard Finley and Sklar screaming about a fire. Pugh stated that he jumped out of his first-story window and saw people running out of the house. Pugh got into his truck in order to get it away from the house. As he was leaving, the defendant jumped into his truck and said that he needed to get out of there because, with his warrants, he would be "in jail forever." Pugh drove the defendant to a house which he thought was the house of the defendant's brother.

The State also presented the testimony of Shawn Rader, also known as "Slinky." Rader testified that he was staying at Finley's house on the night of the incident because Finley was going to fix his truck the next day. Rader testified that prior to going upstairs, Finley, Sklar, the defendant, and Jones were using methamphetamine. The four of them then went upstairs and the defendant told Rader to "holler" if he was going to go upstairs.

Rader testified that he was reading magazines when the power went out. Sklar and Finley then came downstairs, went to the garage, and came back with a halogen headlight hooked to a car battery. Later, Sklar came down and went into the garage. At this point, Rader decided to go upstairs to the attic. He yelled upstairs but did not get an answer. As he ascended the stairs, he saw a pan

encompassed in flames fly by. He then ran back downstairs. The defendant ran past him and out the door.

Agent L.D. Matthews of the Drug Enforcement Agency (DEA) testified regarding the heat reduction method of methamphetamine production. Methamphetamine is produced from the breakdown of ephedrine or pseudoephedrine, common ingredients in over-the-counter medications such as cold tablets. The ingredients are separated from the binder material in the tablets by adding a liquid cleaning solvent such as Naptha or methanol such as that found in Heet antifreeze. The mixture is allowed to sit for a period of time, during which the ephedrine is absorbed by the liquid and the binding material settles to the bottom. The liquid is then removed for further processing.

The liquid is evaporated, usually through the application of a heat source, leaving behind the ephedrine in a powder form. Red phosphorous and iodine crystals are then added to the ephedrine powder. The combination of these three powders will create heat but most manufacturers also apply heat to the powders to speed up the process. A small amount of water is added to make a syrupy mixture and the mixture is cooked for several hours until the powders have liquified.

At this point, the mixture is removed from the heat and left to cool. It separates into a dark maroon liquid and a red phosphorus sludge. The mixture is filtered through a common coffee filter and the liquid saved. The liquid now contains methamphetamine but not in a usable form. The liquid must be neutralized through the application of a base such as that found in Red Devil lye. A solution of lye and water is added to the liquid. Coleman stove fuel is then added. The methamphetamine is drawn into the stove fuel and other contaminants sink to the bottom. The contaminants are discarded and either hydrochloric, muriatic, or sulfuric acid is added to the solution to make it crystallize. The result is methamphetamine in a powder form. The methamphetamine powder is white but it can be other colors depending upon how much of the contaminants still remain. The powder is then dried out over slow heat. If the powder contains too many contaminants, acetone is applied to clean it out. The powder is then ready to be used.

The process is very dangerous. Not only are the chemicals used at each stage very flammable in and of themselves, but their fumes can also be flammable. The acids used can eat through clothing and skin, and the lye can also cause burns. The red phosphorus used is a flammable solid which is commonly used in explosives, fireworks, and road flares. Iodine crystals, if exposed to air higher than 60 degrees in temperature, will emit poisonous fumes. If the solution is allowed to dry out too much during the cooking process, deadly phosgene gas is created. This situation is exacerbated by the fact that most persons making methamphetamine learn to do so by watching others do it, buying certain recipes, or through trial and error. Most of the time, the whole process is not done at one location, but instead different parts are done at different locations.

A search of the attic by officers of the DEA uncovered evidence of methamphetamine manufacture, including several Coleman fuel cans; glassware, including a glass measuring cup and a round bottom flask; a melted plastic container with a two-layer liquid; an electric skillet; a propane bottle; a 32 oz. bottle of muriatic acid; a 32 oz. bottle of hydrochloric acid; a 32 oz. can of acetone; and a 12 oz. can of Red Devil lye. On the main floor of the residence, officers found a black billfold with two spoons containing white residue. In a plastic trash bag outside the house, officers found two 32 oz. cans of VMP Naptha; four empty 12 oz. plastic bottles of Heet antifreeze; three empty gallon cans of Coleman fuel; an empty 12 oz. can of Red Devil lye; three plastic funnels; coffee filters stained with red phosphorous residue; plastic baggies; and 19 empty pseudoephedrine bottles; and some plastic tubing. In a rental car belonging to Jones which was parked outside the residence, officers found a 32 oz. bottle of hydrochloric acid, two flasks, a black spoon with white reside, a silver hand scale, a 500 ml. glass bottle of acetic acid; a brown glass bottle of methanol, and a 32 oz. bottle of glass cleaner.

One of the pseudoephedrine bottles was retained as a sample. A sample was also taken of the liquid found in the burned plastic container in the attic. The Kansas City, Kansas, Fire Department also kept a propane torch discovered in the attic, the remains of a red plastic 12-volt lamp, a mass of plastic with a metal pail handle,

a charcoal lighter, a chrome lighter, and a metal cap from a fuel container. The rest of objects found were destroyed as hazardous waste by a methadone lab cleanup contractor brought in by the DEA.

The liquid sampled from the burned plastic container was separated into liquid and solid portions. Analysis of the liquid part revealed the presence of chemicals found in fuel oil, as well as phenacetin, which is a by-product of methamphetamine synthesis. According to a chemist at the DEA laboratory, phenacetin would first appear at the stage where ephedrine is cooked with iodine and red phosphorous, and could be present at any stage from then until the finished product. In the solid portion of the sample, phenacetin was found, as well as some methamphetamine. Based on the fact that the methamphetamine was present in the solid and not in the liquid, it indicated to the chemist that the entire process had been completed and the solid was being crystallized.

Prior to trial, the defendant filed a motion to suppress evidence found at Finley's residence, alleging that the DEA had unlawfully destroyed the evidence, preventing the defense from inspecting it. At a hearing on the motion, the State presented the testimony of Matthews, the DEA agent in charge of the investigation. Matthews testified that the standard procedure for investigating a suspected methamphetamine lab is to do a walk-through to determine what items might need to be collected. Items are photographed and videotaped before being moved and likely items are dusted for fingerprints. The DEA contracts with a hazardous waste disposal company to handle the cleanup because methamphetamine lab chemicals must be disposed of on site. There is no facility within the DEA or the contractor's company for long-term storage of contaminated evidence. As part of the investigation in this case, the officers kept one bottle of pseudoephedrine as a representative sample and one sample of the liquid found, while destroying the rest.

Matthews admitted that federal guidelines for the processing of methamphetamine labs state that the safety officer, together with the chemist and the disposal service, should determine which items are hazardous. He also admitted that in this case, there was no

chemist on site and he did not confer with the disposal company before ordering the destruction of the items recovered. He also did not obtain a court order to destroy the lab.

The district court denied the defendant's motion. The court stated that although in normal circumstances evidence should be preserved, there were good and sufficient reasons not to preserve the evidence in this case due to its toxic nature. The court also noted that the defendant had failed to show bad faith in the destruction of the evidence and there was nothing in the evidence which appeared to be exculpatory in nature.

The defendant was convicted of first-degree felony murder and the manufacture of methamphetamine. He now appeals.

*Analysis and Discussion*

*1. The failure of the trial court to suppress evidence or grant a new trial based on destruction of evidence:*

In cases where the State fails to preserve potentially useful evidence, there is no due process violation unless the defendant shows bad faith on the part of the State. *Arizona v. Youngblood*, 488 U.S. 51, 58, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988); *Taylor v. State*, 251 Kan. 272, 278, 834 P.2d 1325 (1992). The United States Supreme Court stated in *Youngblood* that while the good or bad faith of the State is irrelevant when the State fails to disclose material exculpatory evidence, the Due Process Clause requires a different result where the State failed to preserve evidentiary material "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." 488 U.S. at 57. The Court stated that it was not willing to read the Due Process Clause as imposing on the police an absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance, and

"requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." 488 U.S. at 58.

The presence or absence of bad faith by law enforcement officers for purposes of the Due Process Clause necessarily turns on the officers' knowledge of the exculpatory value of the evidence at the time it was lost or destroyed. 488 U.S. at 57, n. Although Kansas has not spoken on the issue, other courts have held that the determination of whether the State acted in bad faith is one of fact. See *United States v. Richard*, 969 F.2d 849, 853 (10th Cir.), *cert. denied*, 506 U.S. 887 (1992); *United States v. Stevens*, 935 F.2d 1380, 1387-88 (3d Cir. 1991); *United States v. Galvan-Garcia*, 872 F.2d 638, 641 (5th Cir.), *cert. denied*, 493 U.S. 857 (1989).

In *United States v. Heffington*, 952 F.2d 275 (9th Cir. 1991), the Ninth Circuit Court of Appeals was faced with a situation similar to the one at issue here—the destruction of methamphetamine laboratory equipment by the DEA. The Ninth Circuit noted that in destroying the equipment, the DEA was following its own procedures, and stated that "[a] police department's compliance with 'departmental procedure' should be regarded as an indication that the disposal of evidence was not performed in 'bad faith.'" 952 F.2d at 281. The court went on to find that the police did not demonstrate by their conduct that the evidence would have been exculpatory.

In the case at hand, it cannot be said that DEA agents followed their procedures to the letter. Agent Matthews admitted that federal guidelines for the processing of methamphetamine labs state that the safety officer, together with the chemist and the disposal service, should determine which items are hazardous. He also admitted that in this case, there was no chemist on site and he did not confer with the disposal company before ordering the destruction of the items recovered. DEA guidelines regarding the disposal of hazardous material state that in the event that a chemist is not available, the safety officer and the disposal service should determine whether the evidence is hazardous.

While the failure of the DEA to follow its guidelines is troubling, it is not enough to indicate a realization that the evidence was exculpatory. Further, the other actions taken by the DEA fail to show bad faith. Items recovered from the suspected lab were photographed and videotaped before being moved and a number of

items were dusted for fingerprints. One empty bottle was kept as a representative sample, and a sample of liquid recovered at the site was also preserved. The exculpatory value of the evidence was not apparent. Under the circumstances, we conclude that the defendant failed to demonstrate bad faith on the part of the State. The trial court did not err in failing to suppress the evidence or grant a new trial.

## 2. *The insufficiency of evidence based on the theory of impossibility:*

The defendant contends that the trial evidence demonstrated that the manufacture of methamphetamine was impossible. He argues that because no black iodine crystals were present, no methamphetamine production could have taken place.

In making his argument, the defendant advances a claim of "factual impossibility," *i.e.*, where the objective is proscribed by law, but a circumstance unknown to the actor prevents the actor from bringing it about. See *State v. Logan & Cromwell*, 232 Kan. 646, 647, 656 P.2d 777 (1983) (distinguishing factual impossibility from legal impossibility). This claim rests on the following alleged facts: (1) The evidence shows that the fire broke out at the point that the ephedrine was combined with the red phosphorous and black iodine because methamphetamine would be present in the solution after this time; and (2) there were no black iodine crystals present in the solution; thus, methamphetamine production could not have taken place.

The defendant's argument is fatally flawed and refuted by the evidence. The DEA chemist testified that the solution tested contained a small amount of methamphetamine. The presence of methamphetamine, along with the presence of phenacetin, which would first appear at the stage where ephedrine is cooked with iodine and red phosphorous, indicated to him that the process had been completed.

The defendant argues that if the process had gone that far, more methamphetamine would have been detected and, therefore, the methamphetamine that was detected could only have been the result of an earlier cook. However, he cites no facts to support this conjecture. Agent Matthews testified that the amount of meth-

amphetamine manufactured would depend on the amount of ephedrine or pseudoephedrine used and how long it was allowed to soak in order to separate from the binder material. Thus, it is certainly possible that the solution from which the defendant was trying to make the methamphetamine was hastily manufactured or did not contain a large amount of ephedrine.

If the production process had gone to completion, which was indicated not only by the DEA chemist but also by the defendant in his confession, it is clear that there would be no iodine crystals present in the solution because the iodine is used up through its combination with the ephedrine and red phosphorous. Moreover, there was no need for iodine crystals to be at the Finley house for methamphetamine production because the defendant in his confession acknowledged that he brought the solution to Finley for final processing. Finley's actions as reported by the defendant in his confession indicate that the methamphetamine was already present in the solution and that Finley was simply trying to process it into a usable form. The evidence does not support the conclusion that the manufacture of methamphetamine was impossible.

When the sufficiency of the evidence is challenged on appeal, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Johnson*, 266 Kan. 322, 326, 970 P.2d 990 (1998). After review of all the evidence, we conclude that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.

*3. The trial court's refusal to give a requested alternative instruction on felony murder:*

When reviewing challenges to jury instructions, the appellate court is required to consider all the instructions together as a whole and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and the jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. *State v. Mims*, 264 Kan. 506, 514, 956 P.2d 1337

(1998). In a criminal case, the court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. An appellate court must view the evidence in the light most favorable to the party requesting the instruction when considering the trial court's refusal to give a particular instruction. 264 Kan. at 514.

At trial, the defendant asked that an alternative instruction be given on felony murder to the effect that in order to find him guilty of felony murder, the death of Jones had to be the direct result of the commission of the felony. The trial court gave the following instruction based on PIK Crim. 3d 56.02 (1997 Supp.):

> "The defendant is charged in Count I with the crime of Murder in the First Degree. The defendant pleads not guilty.
> "To establish this charge, each of the following claims must be proved:
> 1. That the defendant killed LaDonna Jones;
> 2. That such killing was done while in the commission of, or the attempt to commit, an inherently dangerous felony, to-wit: Manufacture of a Controlled Substance—Methamphetamine; and
> 3. That this act occurred on or about the 1st day of October, 1997, in Wyandotte County, Kansas."

The defendant requested an alternate instruction which stated in pertinent part:

> "The defendant is charged in Count I with the crime of Murder in the First Degree. The Defendant pleads not guilty.
> "To establish this charge, each of the following claims must be proved:
> 1. That LaDonna Jones died during the commission of, or attempt to commit, an inherently dangerous felony, to-wit: Manufacture of a Controlled Substance-Methamphetamine; and
> 2. The death of LaDonna Jones was a direct result of the commission of that felony by the defendant; and
> 3. That this act occurred on or about the 1st day of October, 1997, in Wyandotte County, Kansas."

The major difference between the two instructions is that the defendant's proposed instruction instructs the jury that it had to find that the death of Jones was a direct result of the commission of the felony. The defendant argues that under Kansas law, the death must be a direct result of the felony and the trial court's

failure to so instruct the jury prevented him from effectively arguing the intervening cause of Jones' own negligence in her death.

The defendant goes to great lengths to discuss the role of proximate cause as actionable under Kansas law. However, the cases cited by the defendant pertain to the role of causation in civil actions and are of little value in resolving the defendant's contention.

It is true that there must be a direct causal connection between the commission of the felony and the homicide to invoke the felony-murder rule. See *State v. Underwood*, 228 Kan. 294, 302, 615 Kan. P.2d 153 (1980). However, the general rules of proximate cause used in civil actions do not apply. Rather, a defendant will be found not responsible for the death which occurs during the commission of a felony only if an extraordinary intervening event supersedes the defendant's act and becomes the sole legal cause of death. See *Bonhart v. U.S.*, 691 A.2d 160, 162-63 (D.C. 1997) (act of person going back into burning house to rescue dog not sufficient to break chain of causation for felony murder based on arson); *State v. Leopold*, 110 Conn. 55, 62, 147 A. 118 (1929) (act of boys in attempting to rescue personal possessions from house not sufficient to break chain of causation for felony murder based on arson).

PIK Crim. 3d 56.02 sufficiently incorporates the causation required under the law. The instructions require not only that the death occur during the commission of the felony but that the killing actually be perpetrated by the defendant or another in the commission of the felony. An extraordinary intervening cause would negate this latter element. Thus, if the jury found that the defendant or another was responsible for the death in the commission of the felony, the jury by definition found that no extraordinary intervening cause existed that was the sole cause of the death. The trial court did not err in failing to give the instruction requested by the defendant.

*4. The refusal of the trial court to instruct on ignorance or mistake:*

The defendant contends that his statement to the police wherein he said he did not know for certain that the substance he brought to Finley's house contained methamphetamine was sufficient to

raise the issue of ignorance or mistake and require a jury instruction. This assertion is patently without merit.

A person's ignorance or mistake as to a matter of either fact or law is a defense if it negates the existence of the mental state which the State must prove with respect to an element of the crime. K.S.A. 21-3203. However, as the defendant admitted to the police, even though he was not sure that the substance was methamphetamine, he hoped that it was and intended to complete the manufacturing process to produce methamphetamine. We conclude that there was no evidence which would have supported the giving of the instruction on ignorance or mistake.

## 5. *The charged drug offense merged with the death of the victim:*

The defendant's final contention is that the manufacture of methamphetamine charge merged with the death of the victim such that it could not support the felony-murder charge. Once again, this argument is completely devoid of merit. In 1994, the legislature amended K.S.A. 21-3436 to list certain inherently dangerous felonies which would not merge with homicide and which would support a felony-murder charge even though under prior law they might have merged with the homicide. L. 1994, ch. 341, § 14. See *State v. Sims,* 262 Kan. 165, 171, 936 P.2d 779 (1997); *State v. Alderson,* 260 Kan. 445, 459, 922 P.2d 435 (1996). Included in this list are felonies as provided in K.S.A. 1998 Supp. 65-4159. See K.S.A. 21-3436(a)(14). The manufacture of methamphetamine is a felony under K.S.A. 1998 Supp. 65-4159. By statute, the manufacture of methamphetamine is an inherently dangerous felony that does not merge with the homicide alleged and will support a felony-murder charge. See K.S.A. 21-3436(a)(14).

Affirmed.