No. 102,573

STATE OF KANSAS, *Appellee*, v. ALLEN DALE SMITH, *Appellant*.
(293 P.3d 669)

Opinion filed December 21, 2012.

*Adam M. Hall*, of Collister & Kampschroeder, of Lawrence, argued the cause and was on the briefs for appellant.

*Charles E. Branson*, district attorney, argued the cause, and *Patrick J. Hurley*, assistant district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: In this direct appeal from his jury convictions for aggravated burglary and felony murder, defendant Allen Dale Smith argues that the district judge erred in admitting evidence of other

crimes and in giving a cautionary accomplice witness instruction over a defense objection. He also asserts that he is entitled to reversal of his convictions because of prosecutorial misconduct. To the extent any one of these errors is not enough on its own to require reversal, Smith invokes the cumulative error doctrine. He also challenges his convictions and sentences as multiplicitous.

Although we hold that the prosecutor's repeated references to the "truth" during closing argument did constitute misconduct, we are not persuaded that reversal of Smith's convictions is required. Moreover, under our precedent, there is no merit to his multiplicity argument. We therefore affirm his convictions and sentences.

### FACTUAL AND PROCEDURAL BACKGROUND

On April 29, 2005, 77-year-old Clarence "David" Boose was found dead on his kitchen floor, the victim of a gunshot wound to the back of the head. His Douglas County home appeared to have been burglarized.

John Lewis, then a detective with the Lawrence Police Department, testified that police initially had no leads on the murder, but they were investigating several other burglaries in the area.

On May 7, 2005, Smith turned himself in at the Shawnee County Sheriff's Department. He had outstanding warrants and was being sought for a burglary in Pottawatomie County. He told police that his cousin, Leonard Price, had told him that he, Price, shot someone during a burglary in Douglas County. Smith confessed to being involved with Price in other burglaries in surrounding counties, including burglaries occurring on April 25, 26, and May 3, 2005, *i.e.*, within a few days before and after the Boose burglary and murder.

Smith was interviewed by law enforcement eight times from May 7 to October 31, 2005; only during the last two interviews was he treated as a suspect. Although his story changed from interview to interview, he never admitted to being involved in the Boose burglary and murder.

For his part, Price had fled the state and was picked up in Nebraska on May 9, 2005. He refused to talk with authorities at first but changed his mind in August 2005. At that time, he did not

confess to being involved in the Boose burglary and murder; instead, he implicated Smith and Smith's brother, Scott. When interviewed again in October 2005, Price confessed that he and Smith had committed the Boose burglary together; he said that Smith had shot Boose. Price eventually pleaded guilty to felony murder as a result of the Boose crimes.

Smith was charged with first-degree murder of Boose and aggravated burglary of the Boose home.

The State filed a pretrial motion to admit K.S.A. 60-455 evidence of the April 25, 26, and May 3, 2005, burglaries committed by Smith and Price and to which Smith had confessed. The State argued that the three other burglaries were relevant to establish identity, plan, preparation, intent, and motive. Smith opposed the motion. The district court judge concluded that the evidence was admissible, but only as relevant to identity.

Smith's first trial ended with a hung jury. During his retrial in November 2008, Smith's counsel adequately preserved the K.S.A. 60-455 issue for this appeal by lodging contemporaneous objections during the testimony of witnesses and by seeking and obtaining a continuing objection.

The facts relating to the three other burglaries came in through Price's testimony as well as through the testimony of officers from the counties in which the burglaries occurred. The officers relied on their investigations and on their interviews with Smith. The details of the burglaries included the following:

On April 25, 2005, Smith and Price drove from Topeka to Meriden in Jefferson County. They stopped at the home of John and Patricia Wellborn. No one was home. They broke in and ransacked the home, taking various personal items—checks, food, power tools, a compound bow, and a shotgun—and loaded them into the trunk of Price's car. They drove to Price's camper in Topeka and unloaded the items. Price testified that Smith cashed a forged check stolen from this home. Troy Frost of the Jefferson County Sheriff's Department testified about Smith's confession to the burglary and the details of the forged check investigation. According to Frost, it was not difficult to determine who had forged and cashed the stolen check: Smith had provided his name, Social Se-

curity number, and driver's license number; and he was identifiable
on the bank's surveillance video.

On April 26, 2005, Smith and Price drove to the home of Andrea
Rolfe and Travis Greene, which was in or near Holton in Jackson
County. No one was home. Price used a shotgun to break in by
shooting the door at its locking points. The cousins took personal
checks and a card they thought was worth $1,000. Other stolen
items included tools; a DVD player; a game station; horse saddles;
and several guns, including a black powder cap-and-ball .45 six-
shot revolver. Again, they unloaded these items at Price's camper.
Thomas Drewel, Jr., formerly with the Jackson County Sheriff's
Department, testified about his interview of Smith regarding this
burglary. Smith told Drewel where many of the stolen items ended
up, and these leads checked out. Smith also told Drewel that Price
shot a hole in the floor of the home while trying to load a shotgun.

On May 3, 2005, Price and Smith drove to Wamego in
Pottawatomie County, specifically to the home of Chris and Diana
Umscheid. No one was home. While Price and Smith were loading
Price's truck, Diana's brother drove by, saw Price's truck, and,
knowing the Umscheids were not home, stopped to talk to Price
and Smith about what they were doing. Price and Smith began
shooting at the brother, who sped away. The items stolen from the
Umscheids included financial instruments, guns, canned goods,
jewelry, a four-wheeler, and a washer and dryer. Again, Price and
Smith took the property to Price's camper. Bradley Rose of the
Pottawatomie County Sheriff's Department investigated and inter-
viewed Smith about this burglary. Rose testified that Smith became
a suspect because of the similarity between this crime and other
burglaries. He testified it was "uncommon" to have a burglary in
which the victim's house was "tore up like that." During the inter-
view, Smith first denied that he had fired at the man who stopped
by, but he eventually admitted he had fired a few rounds. Smith
also discussed where he and Price had unloaded the stolen items
and where they could be found. According to Rose, Smith wanted
to pursue a deal on the burglaries in exchange for information
about the murder in Douglas County.

Boose's long-time girlfriend also testified at Smith's retrial. She said that the last phone message she had received from Boose was at 1:25 p.m. on April 29, 2005. When she did not hear from him for the rest of the afternoon and was unable to get hold of him that evening, she drove to his Lecompton home and discovered his body on the floor of his kitchen, with his head positioned in a doorway, surrounded by a pool of blood.

Price was the State's key witness about the Boose burglary and murder. He admitted his multiple prior convictions for crimes of dishonesty, including five misdemeanor thefts, nine burglaries, and two felony thefts. He testified that he was currently serving a 13½-year sentence for the Pottawatomie County burglary and attempted murder. Price also was facing a sentence of 20 years to life after his guilty plea to felony murder in the Boose case. He testified that he was promised nothing in exchange for testimony but that he hoped his sentences would be ordered to run concurrent.

According to Price, he and Smith reconnected a short time before the string of burglaries started, and Smith began staying with Price. The cousins needed money for drugs, and Price said they both came up with the idea of committing burglaries of rural houses. Price talked about the three other burglaries occurring about the time of the Boose burglary and murder, and he said there were "some [other burglaries] that we ain't been charged for."

Price discussed the Meriden burglary and the Holton burglary, during which he and Smith obtained the black powder cap-and-ball revolver. He then focused on the April 29 Boose crimes in Lecompton. Price testified that, the night before, he and Smith talked about their plan to commit a burglary the next day in order to get money for drugs. Price spent the night in his camper, and Smith stayed at the home of relatives Robert and Rashell Reisinger. The next morning, Smith asked Price to bring guns and the black powder revolver because Smith had arranged for their sale.

The pair drove around for a while before settling on the Boose house. Once there, Smith knocked on the door while Price backed up the car. Believing no one was home, Price began rummaging through a glass or crystal change bowl on a dresser in a bedroom.

He pocketed some of its contents, including a wallet. Price then heard someone say, "What are you doing in my house?" and turned to find himself face to face with Boose. Price tried to find a way to run out; the man stepped backward toward the kitchen; then Price heard a gunshot and saw the man collapse. Price stepped around the body and into the kitchen, where Smith was standing with the revolver in his hand. Price and Smith argued because Smith wanted to keep going through the house and Price wanted to leave immediately. Price went to the car, and Smith followed. Still arguing, they left the scene. According to Price, Smith threw out the revolver and a cell phone on the drive, but he held on to the stolen wallet. The pair first drove to Price's camper, and then Price took Smith to the Reisingers' house.

Price also testified that although he did not want to, he and Smith committed one more burglary so that Smith would have money to leave town. On May 3, they broke into a house and "tore it up." Someone, a relative of the homeowners, came up the drive to see what was going on. Price testified that when he came out of the house and saw this, Smith had "already opened up on [the man] with one of the .22s." Price picked up another .22 rifle, and both he and Smith shot at the man's truck. The man took off, and Price and Smith left shortly thereafter, taking the four-wheeler and washer and dryer they had stolen.

Because law enforcement was looking for him, Price left Kansas for Nebraska. He was apprehended by authorities there.

Price did not see Smith again until Price's preliminary hearing on charges filed for the May 3 Pottawatomie County burglary case. Smith testified against Price in that hearing. Price said Smith walked into the courtroom with a smile on his face, took the stand, and said that Price did everything and that he, Smith, had nothing to do with it. Price pleaded guilty in Pottawatomie County and then told his attorney he wanted to talk to Douglas County Sheriff's Department personnel to set the facts straight. He admitted that he initially told police that Smith committed the Boose burglary and murder with someone else. Eventually he confessed his involvement.

Although Price testified that he had "a very good memory," his testimony was inconsistent on whether he and Smith reconnected about 3 months or just a few days before the first burglary. He also could not remember his own girlfriend's last name and suggested "Davenport" when it was "Whitcomb." He could not remember Smith's wife's name or whether Smith and his wife had previously been living in Nebraska, Ohio, or Texas.

Contrary to one of Smith's statements to police, Price testified that he never forced Smith to participate in a burglary and never tricked him into going along by saying he was going "junking" or looking for scrap metal. He also testified that he never committed burglaries by himself; he was always with someone, not always Smith.

At Smith's preliminary hearing, Price had testified that he committed 10 to 15 rural burglaries similar to those at issue here without Smith's help. At Smith's retrial, Price said that his burglaries followed the same pattern, regardless of his accomplice: he sought out unoccupied rural residences, took along guns, wore gloves, looked for the same sorts of items, and took items back to the camper or to his girlfriend's house. Price testified that he never took checks or credit cards from the houses he burglarized with Smith; Smith alone did that. Price said he had never used a credit card before, did not know how, and was afraid that using checks or credit cards would make authorities suspicious of him. Price also testified that, although he always took guns with him, he did not take guns inside the houses he burglarized. He also said that he and Smith only used Price's vehicles, and Price drove.

During cross-examination, defense counsel established that Price repeatedly lied to law enforcement to throw suspicion on Smith and others and keep himself "out of the picture."

Sandy Whitcomb, who was dating Price at the time of the Boose murder, testified that Price and Smith would occasionally stay at her house. She also testified that Price got a washer and dryer for her about May 3, 2005. He told her they had come from an auction, and she paid him $60. She said she was unaware of the burglaries until police executed a search warrant at her house.

Several deputies with the Douglas County Sheriff's Department testified about the Boose investigation, including discovery of Boose's driver's license and flosscard in Price's camper; Boose's bank card on the Kansas River levee not far from Whitcomb's house; and a number of cell phones along with Boose's Visa bank card in Smith's car. Officers also testified about their inability to locate the black powder revolver and about their investigation of cell phone records, prison visitations, and recorded calls.

Detective Pat Pollock described Smith's series of eight interviews.

Pollock told the jury about Smith turning himself in on May 7 and about his confession to involvement in some burglaries, including the Pottowatomie County burglary in which he and Price shot at a man who interrupted them. Smith then offered information about the Boose homicide, saying that Price told him about it on Whitcomb's deck on the evening of April 29 and that Price claimed he had shot an old man.

Pollock said that Smith offered more information on May 8 about the other burglaries he and Price had committed together. During this interview, police learned that Smith possessed some of the credit cards taken from the Boose home.

The next day, Pollock said, Smith offered to take a polygraph test, and police administered one. Police also had obtained statements from the Reisingers, who said Smith was babysitting their children on the day of the Boose crimes. When police asked Smith whether and when he babysat the Reisingers' children, Smith said he believed that he had babysat on April 28 and on May 1.

Pollock described Smith's June 7 interview as a general follow-up.

The next day, June 8, according to Pollock, Smith was to be transported from the Jackson County Jail to the Douglas County Jail. Although Smith had not previously indicated that he knew precisely where the Boose murder happened, he suggested that, if police wanted to take him by the area perhaps he could "help [them] figure out where [Price] might have thrown the gun." On the drive, they crossed over several waterways, but Smith pointed out a particular one about 1/10 of a mile and visible from the Boose

home, saying "that looked like a place that [Price] might have thrown the gun."

Approximately 2 months later, on July 28, police did another general follow-up interview with Smith but obtained little new information, Pollock said.

By August 4, Pollock said, police were ready to confront Smith with inconsistencies between his statements and the statements of others gathered during the investigation. Smith asked if he was a witness or a suspect, and he was told that the authorities should know the answer by the end of the interview. During this encounter, Smith said he had not had any contact with or seen Price from April 28 through April 30, which conflicted with his original statement that Price had confessed to him on April 29. Confronted with the conflict, Smith admitted that he had not been completely truthful. He continued contradicting himself and, for the first time, he maintained he was watching the Reisingers' children all day on April 29. He said that he and his wife had talked on the phone about this.

Finally, Pollock testified, after Price's mid-October confession that he and Smith committed the Boose burglary and killed Boose, police confronted Smith on October 31. Smith made no further admissions and gave police no additional information.

Smith's wife, Terra, testified that she was hospitalized shortly after she and Smith moved back to Kansas from Ohio, and she did not see Smith until April 30. She and Smith were not staying together at that point; Smith was staying with Price. She said she was aware that Price and Smith were robbing people and doing drugs. She heard from her cousin, Rashell, that Smith was watching the Reisingers' children the day of the Boose murder. When Terra learned this, she told police. She was unaware that Rashell had already told police the same thing.

Michael Blodgett testified about conversations with Smith while both were incarcerated, specifically saying that Smith told him about multiple crimes committed with Price. Blodgett testified that Smith discussed how, during a robbery of a jeweler in Douglas County, Price had ended up shooting the victim. Smith threw away the gun. Blodgett admitted that he had not initially been forthcom-

ing with police about the information on the Douglas County burglary and murder. He also admitted that he had been following the story in the news and may have learned some details of the case that way.

Tim James, another witness who had been housed with Smith while both were incarcerated, testified that Smith had said he was locked up because he had committed a burglary with his uncle and they had had to shoot their way out when the homeowner came home. When James told Smith that he "had that same look in his eyes" as other people James had known who had killed, Smith told him that he and his uncle or cousin were burglarizing a residence when "the gentleman came home and [Smith] shot him."

Smith's mother, Elizabeth Falter, testified that she went looking for Smith in early May 2005 and ultimately dropped him off at the police station. She testified that Smith gave her his cell phone, and she erased some or all of the telephone numbers from it. She told Rashell that her son would "not go down for this." Falter also testified that Price's aunt said Price's family would not let Price take the blame.

Dr. Erik Mitchell, the coroner, described the scene at the Boose home and his autopsy of the body. He opined that Boose's death was a homicide and that, based on the evidence, the shooter was standing behind Boose, near a kitchen table when Boose was shot.

After the State rested its case, the defense called Robert and Rashell to the stand. The Reisingers both testified that Smith was at their house on April 29 and watched their children from early in the day until afternoon, while they picked up Robert's paycheck and cashed it and then ate at Wendy's. When they returned, Robert gave Smith money he owed him. Smith left for a short time, then returned and spent the afternoon and/or evening doing drugs with Robert. State cross-examination of the Reisingers drew out some inconsistencies in their testimony and previous statements made to police.

Barbara Parks, a loss prevention specialist with Food 4 Less, corroborated Robert's testimony that he was at the store and cashed his check on April 29 at 1:26 p.m.

Officers Lyle Hagenbuch and Jason Grems both testified that they went to the Reisinger home and interviewed Rashell and Robert separately on May 9. The officers said that Rashell and Robert told them Smith had watched their children from morning until the afternoon on April 29, that he left for a while to get drugs, and that he then returned and "partied" with Robert until dark. They also said Smith's wife may have been at their home part or all of that day.

Erika Newcombe, the secretary at Quincy Elementary School, testified that all of the Reisinger children had unexcused absences from school on April 29.

The last evidence introduced by the defense focused on the credibility of James' testimony by suggesting that James was motivated to falsely implicate Smith in order to distract police investigating James' son.

At the close of all of the evidence, Smith asked the district judge not to give a cautionary instruction on accomplice testimony. The judge denied the request. The judge also provided a limiting instruction on the K.S.A. 60-455 evidence, to which Smith's counsel did not object. Thus the jury instructions included:

"Instruction No. 6: An accomplice witness is one who testifies that he was involved in the commission of the crime with which the defendant is charged. You should consider with caution the testimony of an accomplice."

"Instruction No. 9: Evidence has been admitted tending to prove that the defendant committed crimes other than the present crime charged. This evidence may be considered solely on the issue of identity."

After the jury's guilty verdicts, Smith moved unsuccessfully for a new trial based in part on the admission of K.S.A. 60-455 evidence. He also sought to vacate his first-degree murder conviction on Count I as multiplicitous of his aggravated burglary conviction on Count II, arguing that a defendant cannot be prosecuted and punished for both felony murder and the underlying felony. The district judge rejected this argument. Smith received a sentence of life imprisonment for the felony murder and a sentence of 136 months for the aggravated burglary. The sentences were to run

consecutive to each other, but concurrent with Smith's sentence in the Pottawatomie County case.

## DISCUSSION

### K.S.A. 60-455 *Evidence of Three Other Burglaries*

Smith argues that the K.S.A. 60-455 evidence of the three other burglaries was not relevant to establish identity and was more prejudicial than probative. He also argues that the district judge's limiting instruction was erroneous.

Our rules of evidence state that all relevant evidence is admissible. See K.S.A. 60-407(f). But a judge may, in his or her discretion, exclude otherwise admissible evidence if its probative value is substantially outweighed by the risk that its admission will unfairly prejudice the party against whom it is offered. K.S.A. 60-445; *State v. Leitner*, 272 Kan. 398, 415, 34 P.3d 42 (2001) (although K.S.A. 60-445 requires probative versus prejudicial balancing only when opposing party claims surprise, balancing may require exclusion "as a rule of necessity" when probative value substantially outweighed by risk of unfair prejudice); see K.S.A. 60-403.

Under the version of K.S.A. 60-455 applicable at the time of Smith's 2008 trial, evidence of other crimes or civil wrongs was inadmissible to establish a disposition to commit such acts as the basis for an inference that the person committed the offense at issue. But such evidence could be admitted to prove some other material fact, such as those listed in the statute, e.g., motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Cf.* K.S.A. 2011 Supp. 60-455(a), (b).

This court's rubric for evaluating the admissibility of K.S.A. 60-455 evidence under that version of the statute required that (1) the evidence be relevant to prove a material fact; (2) the material fact be disputed; and (3) the probative value of the evidence not be substantially outweighed by the risk of undue prejudice. See *State v. Torres*, 294 Kan. 135, 139-40, 273 P.3d 729 (2012) (citing *State v. Inkelaar*, 293 Kan. 414, 424, 264 P.3d 81 [2011]); *State v. Prine*, 287 Kan. 713, 724-25, 200 P.3d 1 (2009); *State v. Vasquez*, 287 Kan. 40, 49, 194 P.3d 563 (2008); *State v. Reid*, 286 Kan. 494, 503, 186 P.3d 713 (2008); see K.S.A. 60-406. We review a district

judge's materiality determination de novo. *State v. Wilson*, 295 Kan. 605, Syl. ¶ 3, 289 P.3d 1082 (No. (102,931, filed September 28, 2012); *Reid*, 286 Kan. at 509. This court applies an abuse· of discretion standard of review on the existence of probative value and the weighing of it against the potential for undue prejudice. *Wilson*, 295 Kan. 605, Syl. ¶ 3; *Torres*, 294 Kan. at 140. If K.S.A. 60-455 evidence is admitted, a district judge also must give a limiting instruction to ensure the jury considers the evidence only for the specific reason or reasons it is admitted. *Torres*, 294 Kan. at 140.

In this case, Smith admitted he was involved in three burglaries but denied involvement in the one during which Boose was killed. His theory of defense on the Boose crimes was alibi. In the district judge's detailed ruling on the State's motion to admit evidence of the three burglaries, he specifically set out our standards for admission and found that the disputed issue of material fact was identity, *i.e.*, whether Smith was Price's accomplice at the Boose burglary. The district judge was persuaded that similarities among the burglaries made them probative on identity because all took place within 8 days of each other; involved rural residences; were within driving distance of Topeka; led to ransacking of the victims' belongings, including financial instruments, with no particular targeted property; and resulted in the taking or use of firearms. In addition, all of the burglaries were committed by Price. The district judge recognized that the K.S.A. 60-455 evidence was prejudicial, but he ruled that it was highly relevant to prove identity and that its potential for undue prejudicial effect was outweighed by its logical, probative value. The district judge also gave a limiting instruction.

Smith's first argument is specific: He asserts on appeal that the similarities relied on by the district judge did not actually point to him, as Price testified that he had committed numerous burglaries using the same methods *without Smith*. In short, Smith argues, none of these burglary characteristics was unique to his identity as Price's accomplice and, thus, the three other burglaries had no probative value at a trial on the Boose crimes. The State does not directly address this nuanced argument, instead summarily stating

that the evidence was probative on identity, that it was corroborated by multiple witnesses, and that Smith's concerns were adequately addressed by the limiting instruction.

Given Smith's alibi defense, it is beyond serious dispute that the identity of Price's accomplice was a material fact and that it was in issue at trial. We therefore turn immediately to whether the evidence of the three burglaries met the other requirement of relevance: probative value.

This court has provided that, in analyzing the identity factor of K.S.A. 60-455, the evidence offered

"should disclose sufficient facts and circumstances of the offense to raise a reasonable inference that the defendant committed both offenses. Similarity must be shown in order to establish relevancy. . . . [T]here should be some evidence of the underlying facts showing the manner in which the other offense was committed so as to raise a reasonable inference that the same person committed both offenses." *State v. Blackmore*, 249 Kan. 668, Syl. ¶ 4, 822 P.2d 49 (1991).

See also *State v. Baurock*, 41 Kan. App. 2d 178, Syl. ¶ 9, 201 P.3d 728 (2009) (where offered to prove identity, other crimes evidence should disclose sufficient facts and circumstances of the offense to raise a reasonable inference that defendant committed all of the offenses; crimes must be similar, not identical, to those charged), *rev. denied* 289 Kan. 1280 (2009).

Smith's precise argument has logical and legal merit. If used to prove identity under K.S.A. 60-455, a similar crime must have at least one feature it shares with the charged crime that is unique to the defendant the State seeks to convict. We agree with this general principle.

We disagree, however, with Smith's view about how the principle applies in this case. He argues that the three other burglaries and the Boose burglary lacked a shared feature unique to him. This is not correct. Price testified that he never stole checks or credit cards; Smith did so. This particular category of theft was common to the three other burglaries and the Boose burglary, and Smith possessed at least one credit card stolen from the Boose home. When this factor is considered, along with all of the other similarities mentioned by the district judge, we see no abuse of discretion in the determination that evidence of the three other burglaries

was probative on the identity of Price's accomplice in the Boose burglary and its associated felony murder.

Smith next argues that the district judge abused his discretion in weighing probative value and the risk of undue prejudice. We disagree.

First, the evidence was not merely cumulative. It was telling. Although there was circumstantial evidence against Smith, only the testimony of Price, Blodgett, and James directly connected both Price and Smith to the Boose burglary and murder. In addition, Smith's confession to the other burglaries that were temporal bookends to the Boose crimes for which Smith advanced an alibi defense meant the probative value of the K.S.A. 60-455 evidence on identity was enhanced. See *People v. Perry*, 166 Cal. App. 3d 924, 929, 212 Cal. Rptr. 793 (1985) (uncharged joint robbery evidence probative of identity when one or two defendants not identified by witnesses).

In addition, any prejudice would not qualify as undue, much less overmatch the substantial probative value. For example, there was nothing extraordinarily brutal about any of the three other burglaries that might confuse the jury or result in defendant's effectively being tried for those crimes rather than the crime charged. See *Perry*, 166 Cal. App. 3d at 930-33 (reversible prejudice arises out of mistreatment of victim of other crime).

Under these circumstances, although the other crimes evidence was pervasive at trial, we hold that the district judge did not abuse his discretion in conducting the balance between probative value on identity and the risk of unfair prejudice.

Finally, Smith challenges the correctness of the K.S.A. 60-455 limiting instruction. Because he did not object to this at trial, we are governed by K.S.A. 22-3414(3). We must determine, first, whether the instruction was error and, only if it is, whether it qualifies for the label "clearly erroneous." We will hold that an instruction is clearly erroneous only if we are "firmly convinced that the jury would have reached a different verdict had the instruction error not occurred." *State v. Williams*, 295 Kan. 506, Syl. ¶ 5, 286 P.3d 195 (2012); see *State v. Washington*, 293 Kan. 732, 740-41, 268 P.3d 475 (2012).

Defendant is correct that the language used by the district court in Instruction No. 9 was slightly different than that in PIK Crim. 3d 52.06. Rather than inform the jury that "[t]his [other crimes] evidence may be considered solely *for the purpose of proving the defendant's . . . identity,*" as PIK Crim. 3d 52.06 reads, Instruction No. 9 informed the jury that "[t]his [other crimes] evidence may be considered solely *on the issue of identity.*" (Emphasis added.) Defendant argues that the language employed does not prevent an illegal use of the evidence, *i.e.,* that the jury would consider the other crimes evidence as evidence of defendant's propensity for violence or propensity to burgle.

We are not persuaded that the instruction was erroneous, much less clearly erroneous. It was consistent with Kansas law. It informed the jury that the evidence of other burglaries was to be considered for a specific purpose, and this limited permissible use was reiterated by the prosecutor in closing argument. Although the instruction did not track the language of the pattern instruction verbatim, it was factually and legally appropriate in light of the entire record. See *Williams,* 295 Kan. 506, Syl. ¶ 4. Smith is entitled to no relief on the ground of this instruction.

## Cautionary Accomplice Witness Instruction

Smith's next argument on appeal echoes his district court challenge to the giving of the cautionary accomplice witness instruction over his objection.

When a party has objected to an instruction at trial, the instruction will be examined on appeal to determine if it properly and fairly states the law as applied to the facts of the case and could not have reasonably misled the jury. When making this determination, an appellate court is required to consider the instructions as a whole and not to isolate any one instruction. *State v. Appleby,* 289 Kan. 1017, 1059, 221 P.3d 525 (2009).

Smith asserts that the accomplice witness instruction, directing the jury to consider Price's testimony with caution, created a negative inference regarding the testimony of others in this trial. In short, he complains that his jury would have understood that the

testimony of other witnesses, specifically nonaccomplice jailhouse informants, should *not* be weighed with caution.

Smith acknowledges, however, that the district judge was correct about existing law making the instruction appropriate. See, *e.g.*, PIK Crim. 3d 52.18; *State v. Anthony*, 242 Kan. 493, 498-502, 749 P.2d 37 (1988) (accomplice instruction proper even when accomplice testimony favorable to defendant, defendant objects to the instruction). Smith seeks a holding that a defendant should be allowed to waive the giving of the instruction for strategic reasons.

Our 1988 *Anthony* case presented this court with the first-impression question of whether it was improper for a trial judge to give an accomplice instruction over a defendant's objection when the accomplice's testimony was favorable to a criminal defendant. 242 Kan. at 500. The court acknowledged the then-majority rule that an accomplice instruction is required only when the testimony is harmful to the defendant, but "adopt[ed] the minority view that a cautionary instruction on accomplice testimony is proper in all circumstances where an accomplice testifies." *Anthony*, 242 Kan. at 501-02. The court reasoned that

"[s]uch testimony on behalf of defendants is becoming more prevalent all the time, particularly by spouses or convicted friends of the accused who have nothing to lose by taking the blame. Here, the defendant was not branded as one who committed a crime. The instruction states the accomplice witness is one who testifies he was involved in the commission of the crime 'with which the defendant is charged.' That is not prejudicial, particularly where the witness testifies she committed the crime and the defendant is innocent." *Anthony*, 242 Kan. at 502.

As Smith concedes, *Anthony* is still good law. In addition, in the recent case of *State v. Elnicki*, No. 96,179, 2009 WL 2242417 (Kan. App. 2009) (unpublished opinion), *rev. denied* 290 Kan. 1097 (2010), a defendant urged the Court of Appeals to reject the *Anthony* rule. Noting it was duty-bound to follow this court's precedent, and noting that there was no indication this court was departing from *Anthony*, the panel declined the defendant's invitation and found no error in the district court accomplice instruction. *Elnicki*, 2009 WL 2242417, at *3-4 (Kan. App. 2011) (also noting several other jurisdictions have adopted Kansas' approach since *Anthony*); see also *State v. Rodarte*, No. 102,132 2011

WL 1814709, at *3-4 (Kan. App. 2011) (unpublished opinion) (rejecting same argument; *Anthony* controlling). This court denied review of *Elnicki*.

Before *Elnicki* was decided, one panel of our Court of Appeals suggested that, in certain circumstances, "an accomplice instruction could potentially prejudice a defendant" and under such circumstances, "[a] *sua sponte* accomplice instruction . . . would [be] inappropriate." *State v. Swarthout*, No. 94,823, 2007 WL 2377084, at *3 (Kan. App. 2007) (unpublished opinion) (where defendant denied participation in crimes, accomplice's testimony at trial consistent with defense, use of accomplice instruction as to accomplice's pretrial statements inculpating defendant could raise inference that all of accomplice's statements suspect; no error in failure to give instruction), *rev. denied* 285 Kan. 1177 (2008). Here, however, the circumstances are less compelling than those in *Swarthout*. Smith's argument is that the giving of the instruction, although not in and of itself prejudicial, created a negative inference about the testimony of other witnesses whose testimony arguably should also have been considered with caution. We see no reason to depart from our precedent at this time. We therefore hold that the district judge did not err in giving the accomplice witness instruction over Smith's objection.

## Prosecutorial Misconduct

Smith also argues on appeal that he is entitled to reversal of his convictions and a new trial because of several instances of what he believes to have been prosecutorial misconduct during closing argument.

Appellate review of an allegation of prosecutorial misconduct involving improper comments to the jury requires a two-step analysis. First, the court determines whether the prosecutor's comments were outside the wide latitude the prosecutor is allowed in discussing the evidence. If misconduct is found, the appellate court must determine whether the improper comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Bur-*

*nett*, 293 Kan. 840, 850, 270 P.3d 1115 (2012); see *State v. Elnicki*, 279 Kan. 47, 58, 105 P.3d 122 (2005).

In evaluating prejudice, the appellate court considers three factors: "(1) whether the misconduct was gross and flagrant, (2) whether the misconduct showed ill will on the prosecutor's part, and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors." *State v. Raskie*, 293 Kan. 906, 914, 269 P.3d 1268 (2012). " 'None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 . . . and *Chapman v. California*, 386 U.S. 18, [22,] 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) . . ., have been met.' [Citation omitted.]" *State v. McCaslin*, 291 Kan. 697, 715-16, 245 P.3d 1030 (2011). The basic test asks whether the error affected the defendant's substantial rights, meaning whether the error affected the outcome of the trial. See *State v. Ward*, 292 Kan. 541, 553-55, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). The State, as the party benefitting from the alleged misconduct, bears the burden to establish that there is no reasonable possibility the error affected the verdict. *Inkelaar*, 293 Kan. at 430-31.

Smith points to several comments made by the prosecutor. In addition to highlighting these comments in his brief, Smith submitted two letters of additional authority to the court under Kansas Supreme Court Rule 6.09(b) (2011 Kan. Ct. R. Annot. 49), alleging that the prosecutor in his trial has repeatedly made similar comments in other cases. He asserts that this pattern means the comments in this case were not innocent or isolated but were part of a pattern of gross, flagrant misconduct that demonstrates ill will.

We address the propriety of each challenged comment individually before addressing Smith's attack on the collective comments or his allegation of a pattern of misconduct demanding reversal of his convictions.

Smith first suggests that the prosecutor improperly vouched for Price's testimony:

"And, you know, I know it's difficult to say, 'Believe Leonard Price.' And he is believable. When you go back and think about it, there are lots of reasons to believe him. And if you believe him, you find Allen Smith is indeed a cold-blooded murderer here in killing [the victim] in his own kitchen.'"

It is improper for prosecutors to offer juries their personal opinions on the credibility of witnesses. *State v. Stone*, 291 Kan. 13, 19, 237 P.3d 1229 (2010). And it would be improper for the prosecutor to say only that a witness "is believable." However, when this comment is reviewed in the context in which it was offered, it merely invited the jury to analyze the evidence supporting Price's testimony; to consider its believability; and, if the jury believed it, to find Smith guilty. But for the court reporter's choice of punctuation in the transcript, the prosecutor's statement could be interpreted to say, "[I]t's difficult to say, 'Believe Leonard Price,' and 'He is believable.' [But] . . ., there are a lot of reasons to believe him." This does not constitute "vouching" for a witness' credibility. *Cf. Elnicki*, 279 Kan. at 58-68.

Smith also argues that the prosecutor made an improper appeal to the jurors' sympathy when suggesting that "there wasn't a person in this courtroom that was listening to Leonard Price" who "didn't imagine him in their own house. It's disturbing to hear. Especially for anyone who's ever been burglarized."

Although this comment was arguably improper as a golden rule or sympathy argument and did not address the evidence in this case, it focused on Price, the State's witness, rather than on Smith. It also was innocuous when compared to sympathy appeals held to be reversible misconduct. See *State v. Kunellis*, 276 Kan. 461, 476-80, 78 P.3d 776 (2003) (prosecutor's statements, testimony painting "Norman Rockwellesque" picture of victims' lives just before accident designed to inflame jury); *State v. Finley*, 268 Kan. 557, 570-72, 998 P.2d 95 (2000) (improper appeal to sympathy, local standards when prosecutor informed jurors they enforced laws, could not tolerate "this kind of drug use in our community").

Smith also faults the prosecutor for telling the jury which parts of the alibi defense to believe. But we see the complained-of portion of the argument differently. It was fair comment on the inconsistencies in Smith's series of shifting stories to police about his

whereabouts and activities during the days surrounding the Boose burglary and murder. As such, it was within the wide latitude afforded the State in closing argument.

Smith also argues that the prosecutor engaged in improper name calling and commented on Smith's credibility in her rebuttal by stating:

> "You know, closing argument is a time for a lot of things, and generally I don't stand up here and call anyone names, but [defense counsel] kind of did it for me. He went ahead and said, you know, all these different things about his client being a liar and, you know, looking bad.
>
> "Well, he doesn't look bad, he looks guilty. And you know one thing he didn't call him, which we also all know about Allen Smith, is that he's a snitch. And this is a case where, yeah, you could name a lot of people being snitches, but who was the first?"

The State argues that "no error occurs where questionable statements by prosecuting attorney are provoked and made in response to prior . . . statements by defense counsel." Defense counsel, in closing, admitted that Smith was a "criminal," a "burglar," an "attempted murderer," and a "liar"; and counsel used the word "snitch" several times in reference to other witnesses. Although these comments could not properly "provoke" the prosecutor to "respond" by adding that Smith was also a "snitch," the prosecutor's comment was, in fact, made in the context of describing the evidence. In her earlier discussion, the prosecutor asked the jury to compare how Price and Smith came forward to police. Price was, for several months after being picked up, silent. But Smith turned himself in and began "singing away." The prosecutor's rebuttal statement that, in fact, Smith "was the number one snitch in this case . . . first in the door" was a fair description of the evidence before the jury.

Smith also faults the prosecutor for misstating the State's burden of proof by telling jurors that "[i]f you believe Leonard Price, if you believe him, you have vaulted yourself over the hurdle of beyond a reasonable doubt, because he sets out every single element right there. He sets it out, and Allen Smith is guilty if you believe Leonard Price."

As the State argues, this statement, taken in context, was merely an invitation to examine the State's evidence; it was not an attack on material that Smith presented or failed to present, and it did not constitute improper burden shifting. *Cf. State v. Pabst,* 268 Kan. 501, 511, 996 P.2d 321 (2000) ("If you don't believe [defendant], then he's guilty. And he admits it"; improper statement of State's burden).

Smith's final attack on the prosecutor's argument centers on her repeated use of the word "truth" to describe the State's case.

"And you know, it is hard work to get to the *truth*, and there is a lot to sort through. But the *truth* is there, and the *truth* is here in this courtroom, and the *truth* was presented to you through the course of last week.

"And the *truth* is the only thing that David Boose has right now. He was alone in his kitchen. He was surprised by these two people trying to take things that were his. He was unprotected, and he was shot. Executed.

"But today, in this courtroom, he has the *truth*. And the *truth* will give him a verdict against Allen Smith for aggravated burglary, and a verdict against Allen Smith for shooting David Boose in the head. Those verdicts won't replace David Boose. They won't bring him back. They won't fill the hole that is in his family's life, but they will give us the *truth*." (Emphasis added.)

In our 2005 decision in *Elnicki*, a prosecutor's statement that " 'the truth shows you beyond a reasonable doubt the defendant is guilty of the crimes with which he is charged' " was held to be an improper comment on the credibility of the State's evidence. *Elnicki,* 279 Kan. at 64. The State argues that the prosecutor did not do the equivalent here; she merely stated that the victim would find justice through the truth, and her argument pointed out evidence that defendant had burglarized the house and shot Boose.

We disagree. We regard the prosecutor's repeated invocation of the "truth" as error of exactly the same type we saw in *Elnicki*. Moreover, *Elnicki* was not news on the impropriety of such an invocation. We and other judges, including the justices of the United States Supreme Court, had previously said that prosecutors should not assert sole possession of the "truth." See, *e.g., United States v. Young,* 470 U.S. 1, 4-14, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985); *State v. Pham,* 27 Kan. App. 2d 996, 1004-06, 10 P.3d 780 (2000); *State v. Mosley,* 25 Kan. App. 2d 519, 524-25, 965 P.2d 848, *rev. denied* 266 Kan. 1113 (1998), *overruled on other grounds*

*by State v. Jasper*, 269 Kan. 649, 8 P.3d 708 (2000); see also *Pabst,* 268 Kan. at 506 (citing Kansas Rules of Professional Conduct [KRPC]; American Bar Association of Standards of Criminal Justice); KRPC 3.4 (2011 Kan. Ct. R. Annot. 566).

Even without the episodes described in the Rule 6.09 letters, which are dependent on material outside the record before us, the prosecutor's behavior is perilously close to gross and flagrant and demonstrative of ill will. However, the evidence against Smith, both direct and circumstantial, was abundant and reinforced by his confession to a string of contemporaneous rural residence burglaries with Price. We have no hesitation in holding that the prosecutor's error was harmless under both the K.S.A. 60-261 standard and the *Chapman* standard. Smith is not entitled to reversal and new trial for prosecutorial misconduct.

*Cumulative Error*

Cumulative trial errors, when considered collectively, may require reversal of the defendant's convictions when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. If the evidence is overwhelming against the defendant, however, no prejudicial error may be found based upon this cumulative error rule. *Thompson v. State*, 293 Kan. 704, 721, 270 P.3d 1089 (2011).

Having discerned only one trial error in this case and dealt in the preceding section with whether it required reversal, we need not evaluate cumulative error. See *State v. Foster*, 290 Kan. 696, 726, 233 P.3d 265 (2010).

*Multiplicity*

Whether convictions or sentences are multiplicitous is a question of law over which this court's review is unlimited. *State v. Simmons,* 282 Kan. 728, 743, 148 P.3d 525 (2006); *State v. Schoonover*, 281 Kan. 453, 462, 133 P.3d 48 (2006).

Smith argues that, under the identical elements test, aggravated burglary and felony murder based on aggravated burglary as the underlying felony are the " 'same' offense," *i.e.*, they are multiplicitous; that our *Schoonover* decision interpreting the statute to al-

low multiple punishment for, in that case, robbery and felony murder, was wrongly decided; that K.S.A. 21-3436 does not provide for cumulative punishment but merely codifies the merger doctrine; and that he cannot be punished for both felony murder and aggravated burglary under the federal Double Jeopardy Clause. Although phrased as a challenge to both convictions and sentences, this argument potentially affects only Smith's sentences, as his counsel acknowledged at oral argument.

Smith points to *Whalen v. United States*, 445 U.S. 684, 692, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980), and argues that the crime of felony murder includes all of the elements of the crime of aggravated burglary. But Smith fails to acknowledge that felony murder requires proof of an element not necessary to prove aggravated burglary, *i.e.*, the killing of a human being. See *Schoonover*, 281 Kan. at 498.

Smith suggests that this court's statement in *Schoonover* that the legislature authorized multiple punishments by enacting K.S.A. 21-3436 was mere dicta and this court should cease relying on it. See *Schoonover*, 281 Kan. at 490.

K.S.A. 21-3436 lists certain inherently dangerous felonies that do not merge with homicide and therefore can support a felony-murder charge/conviction. *State v. Lamae*, 268 Kan. 544, 556, 998 P.2d 106 (2000). Aggravated burglary is one of them. K.S.A. 21-3436(a)(10); *State v. Makthepharak*, 276 Kan. 563, 571, 78 P.3d 412 (2003); see K.S.A. 2011 Supp. 21-5402(c)(1)(J). Contrary to Smith's position, an inherently dangerous felony such as aggravated burglary does not merge into felony murder under Kansas' statutory scheme, and a defendant may be convicted and sentenced for both offenses even when the aggravated burglary is the underlying felony for the felony murder. See *State v. Pham*, 281 Kan. 1227, 1262-63, 136 P.3d 919 (2006) (inherently dangerous felony statute, K.S.A. 21-3436, states legislature's intent to allow cumulative punishment for felony murder and inherently dangerous felonies). Smith's citation to other caselaw, treatises, and the rule of lenity is inapposite where, as in Kansas, the legislature has spoken clearly. *Cf. Whalen*, 445 U.S. at 692.

Smith offers no compelling reason for us to revisit or revise the *Schoonover* analysis or related caselaw. As recently as a few months ago, we specifically declined an invitation to do the same in an appeal from convictions of felony murder and aggravated robbery. *State v. Parks*, 294 Kan. 785, 801-04, 280 P.3d 766 (2012).

## CONCLUSION

Because we hold that defendant Smith has demonstrated the existence of only one trial error and it does not demand reversal of his convictions, the judgment of the district court is affirmed.